**Opinion issued December 11, 2018**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00578-CV

————————————

## IN THE INTEREST OF J.D.G. AND A.E.G.J., Children

On Appeal from the 314th District Court
Harris County, Texas
Trial Court Case No. 2015-03930J

## O P I N I O N

After a two-month-old boy was hospitalized from injuries caused by his father's shaking him, the infant and an older sibling were removed from the family home. Some 35 months later, the trial court entered an order terminating the parental rights of both parents. The mother appeals, challenging (1) the sufficiency

of the evidence to support the trial court's three predicate findings[1] for termination of her parental rights, best-interest determinations[2], and appointment of the Department of Family and Protective Services as the children's managing conservator; (2) the applicability and sufficiency of the evidence on an affirmative defense relevant to one of the predicate findings against her,[3] and (3) an evidentiary ruling.[4]

We affirm.

## Background

### A.    Javier severely injures Andres

Early one Friday morning, Monica[5] fed her two-month-old son, Andres, placed him in bed with his father, Javier, and left the house to be at work by 5:00

---

[1]    *See* TEX. FAM. CODE § 161.001(b)(1)(D) (endangering conditions), (E) (endangering conduct), (O) (failure to comply with court order containing requirements for return of children).

[2]    *See id.* § 161.001(b)(2) (best interest).

[3]    *See id.* § 161.001(d) ("A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that: (1) the parent was unable to comply with specific provisions of the court order; and (2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.").

[4]    The father did not appeal termination of his parental rights. The record indicates that he was deported from the country, but his current location is not established.

[5]    The parents, children, and other relatives will be referred to by pseudonyms instead of initials for ease of reading.

2

a.m. Around 11:00 a.m., Javier called Monica at work to tell her something had happened to Andres. He told her Andres had been crying, he held the baby, Andres began to fall from his arms, he tried to grab Andres, and, in doing so, he "kind of maybe shook" Andres. Javier told Monica that Andres turned purple and stopped breathing and that he performed CPR on Andres to help him begin breathing again. Javier assured Monica that Andres seemed fine at the time of the phone call. Javier told Monica he was leaving for work and would drop Andres and his almost-two-year-old brother, Jorge, at their aunt's house.

The aunt, Celia, later stated Andres appeared normal to her when Javier brought him to her house. She said Javier told her Andres had almost fallen earlier that morning and Javier had to grab him by his feet to prevent the fall. Javier told Celia to call him or 911 if anything appeared wrong with Andres while in her care.

Monica left work about 40 minutes later to pick the kids up from Celia's house. Monica later said that Andres appeared normal when she arrived and continued to seem fine the next day. Neither Celia nor Monica saw any signs of injury.

On Sunday, April 19, 2015—which was the second day after the incident—Monica was back at work when she received a call from Javier around 9:00 a.m. He told her that he had accidentally startled Andres, who then seemed unable to cry or breathe. Javier told Monica that he was taking Andres to the hospital.

3

The hospital determined Andres had a subdural hemorrhage and difficulty breathing. The medical staff intubated Andres and life flighted him to Memorial Hermann Children's Hospital. Tests revealed brain bleeding and seizure activity. The medical staff noted that the findings were consistent with Shaken Baby Syndrome. Andres was admitted to the hospital, where he received medical care for two and one-half weeks. He then was transferred to Shriner's Hospital, where he remained another three weeks.

Andres ultimately was diagnosed with Shaken Baby Syndrome and complex epilepsy with seizures. He was prescribed anti-seizure medications, but, by the time the case reached trial, he was no longer on these medications. In a 2018 trial report, DFPS stated that Andres did not have any developmental delays from his injuries but still required physician monitoring due to his diagnosis.

**B.     DFPS investigation and pendency of conservatorship suit**

**1.     2015**

Andres's injuries occurred in mid-April 2015. Jorge was immediately removed from the family home and placed with an adult relative, Julia. Both parents were permitted supervised visits with Jorge at Julia's home. Andres remained in a medical facility until late May, when he also moved in with Julia. Neither parent had a criminal record when Andres was injured. Both parents were

4

employed. The trial court ordered both parents drug tested; all test results were negative.

Officer B. Andrade with the Houston Police Department interviewed Javier on April 28, 2015—11 days after the incident. At first, Javier described a series of events similar to what he had told Monica and Celia. Andrade told Javier his story was not consistent with Andres's injuries. Javier then said, "The truth is I shook him." Javier said that Andres had been crying that morning and acting "bipolar." Immediately after Javier shook him, Andres stopped crying but also stopped breathing. Javier said that he shook Andres again to get a response. At the end of the interview, Javier asked Andrade if anyone was going to tell Monica "what he had done." Andrade responded that Javier could tell Monica "when he was ready."

It is not clear from the record when Monica learned what had occurred. The DFPS caseworker, S. Butler, for example, testified that Javier had told Monica in early May that he shook Andres, but she later testified that it was possible Monica did not learn the truth until DFPS informed her in mid-May.

Once Julia learned in mid-May that Javier had admitted to law enforcement that he had shaken Andres, she asked that supervised visits occur at DFPS's offices instead of her home. The trial court approved the change. Javier was arrested on May 26. Andres was released to Julia's care on May 27. Javier was released on bail on June 9. DFPS then sought sole managing conservatorship over the children "due

5

to concerns with the safety of the children, and the parent's inability to provide a safe environment for the child[ren]." According to DFPS caseworker, Butler, Monica was continuing "to assert that the father has no complicity in the injury and that shaking the baby was just an accident." At the adversarial hearing in July, Butler testified that Javier and Monica continued to live together after Javier's release on bond.

The children's pediatrician, Dr. Syed Rizvi, testified. He stated that Monica had always been reasonably compliant with health care instructions.

When Monica testified, she clarified that Javier moved in with her when he was released on bail one month earlier but that he was in the process of moving out at the time of the hearing. She stated she was willing to end her relationship with Javier to have her children returned to her care.

The trial court granted DFPS's request for temporary orders naming DFPS temporary managing conservator of the children, continuing the children's placement with Julia, and continuing supervised parent visits at DFPS offices.

In August, the court held a status hearing. DFPS announced a permanency goal for family reunification. Monica and Javier were ordered to comply with DFPS family service plans. Monica's plan required her to attend eight weeks of parenting classes, attend hearings and DFPS meetings, confirm with DFPS all scheduled visits with her children, complete a psycho-social evaluation, timely

6

report changes in residence and employment to DFPS and the court, obtain and maintain employment, and "obtain, pay for and maintain appropriate housing for herself and child . . . [to be] demonstrated by providing a copy of a lease agreement and through home visits by the caseworker." The plan listed certain goals for Monica, including understanding the serious nature of the situation that placed Andres in danger, demonstrating an ability to change to provide her children with adequate care and nurture, demonstrating a willingness and ability to protect her children from harm, participating in therapy, demonstrating the ability to follow medical advice for her children, and adequately following the safety plan to control the risk of abuse or neglect. The court appointed Child Advocates as the children's guardian ad litem.

DPFS's status report submitted to the court two months later states that Javier and Monica were still living together, that Monica continued to describe Andres's injuries as an accident, and that Monica failed to inform DFPS once Javier admitted to her that he shook Andres.[6] The primary permanency goal in this October report changed to family adoption, with a secondary goal of family reunification. DFPS noted, though, that Monica was progressing in completing her service plan.

---

[6] As noted earlier, Jenkins's testimony is unclear whether Javier admitted to Monica that he shook Andres or if, instead, she learned that information directly from DFPS.

### 2. 2016 and the start of trial

In April 2016, one year after the incident in question, the children's caregiver returned them to DFPS, indicating that she felt frustrated with "the process" and no longer wanted to be responsible for the children. DFPS sought court approval to transfer the boys to foster care and to continue supervised parent visits. At the status hearing to approve the change, a new DFPS caseworker, Y. Jenkins, testified that Child Advocates recently had made an unannounced visit to Monica's home and encountered Javier leaving the area by jumping a fence. Jenkins testified that DPFS has ongoing concerns with Monica's protective capacity due to her continued contact with Javier.

The Child Advocates volunteer, J. Gonzalez, testified that when he made the unannounced visit, he and his co-worker saw Javier jump a fence to leave the area; Monica did not answer the door and instead walked directly to her car to leave; he asked her about contact with Javier; and Monica said he was there only to bring her money. Gonzalez, whom Monica allowed in the house, saw no evidence Javier was living there. Monica denied he was living there. Monica testified that Javier was simply leaving a money envelope on her porch and that Child Advocates happened to arrive as he was leaving.

In June 2016, the court-appointed attorney ad litem recommended that the children be moved to a different foster home due to inappropriate supervision of

the children by their current foster placement, as observed during a recent home visit.

At a hearing one month later, the Child Advocates guardian ad litem testified that he did not support family reunification, citing multiple reasons: the March incident in which Javier jumped a fence leaving Monica's home, concerns over a lack of support system for Monica, concerns over whether Monica could financially support the children if they were returned to her as she continued to rely on Javier for financial assistance, and a statement by Monica during an earlier court hearing declining to hold Javier responsible for Andres's injuries. The guardian ad litem testified that Monica had demonstrated that "she cannot protect the child." The final hearing date was extended to November 15.

In September, the children were moved to a different foster home. According to a DFPS report, the change was due to "allegations . . . made against the previous home."

On November 11, just before the scheduled November 15 hearing date, DFPS submitted a permanency report to the court that changed the permanency goal from family adoption to reunification with Monica, though not Javier. DFPS reported that Monica had completed her psycho-social evaluation, parenting classes, and individual therapy. She lived in her own apartment and provided a

copy of her lease agreement. She had shown proof of employment. DFPS recommended that the court schedule the permanency hearing five months later.

Child Advocates did not share DFPS's permanency goals. In its November report to the court, Gonzalez recommended termination of both parents' parental rights. While noting that Monica had completed her service plan requirements, the Child Advocates report expressed the ad litem's concern that Monica "lack[ed] protective capacity to care for the children" because she earlier stated she did not believe Javier harmed Andres and because Javier was observed jumping the fence on an unannounced Child Advocates visit. Although DFPS was willing to change its recommendation to reunification with Monica after these two events were known, Child Advocates believed this history continued to support termination, even though Monica was successful in completing her family service plan and participating in supervised visits with the children.

Trial began on November 15, 2016. Javier's counsel noted that Javier's criminal matter had not yet resolved. DFPS announced that the current permanency goal for Monica was reunification. A few exhibits were admitted, and DPFS caseworker Jenkins provided four pages of testimony. She stated that Andres was developmentally on target without any repercussions from the shaking incident. When Jenkins was unable to provide precise answers to questions from the court, DPFS requested to "step back" and gather additional information, and the trial

court agreed. No additional evidence or witness testimony was offered until 18 months later, in May 2018.[7]

### 3.    2017

In the interim, in February 2017, Child Advocates submitted a court report again recommending termination of Monica's parental rights. It listed the two reasons discussed in the earlier report and elaborated that Monica had "not been truthful in regards to her contact" with Javier or the fence-jumping incident. It added as a third reason that Monica had been asked in an earlier permanency hearing if she believed Javier harmed the children and she had answered, "No." Child Advocates also reported that, while Monica eventually conceded that Javier "could have hurt the children," she also had continued to rely on Javier for financial support, which, in its view, indicated she was not protective of the children or able to provide them a safe and stable environment.

---

[7]    Section 263.401 of the Family Code provides that the trial court's jurisdiction ends after one year unless the court "*has commenced* the trial on the merits" or grants an extension. TEX. FAM. CODE § 263.401(a)–(b) (emphasis added). The extension requires a finding that "extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *Id.* § 263.401(b). The parties may not extend the deadlines by agreement or otherwise. *Id.* § 263.402.

These November 15 events commenced trial. There is no statutory requirement that a commenced trial be completed within any specified period of time. This trial—with four trial witnesses—lasted 18 months.

DFPS submitted a permanency report in June 2017—now two years after the original incident—that changed the permanency goal from reunification with Monica to unrelated adoption because Monica lacked "protective capacity." It noted that Andres and Jorge's then-current foster care provider was willing to be a permanent placement if the parents' rights were terminated. DFPS described the foster home favorably and noted that the children were bonded to their foster care provider. In this report, DFPS recommended termination of Monica's parental rights under Subsection (O) because "she has failed to comply with the court order to maintain no contact with the perpetrator of the case [Javier]."[8] DFPS requested the court schedule a permanency hearing six months later.

### 4. 2018 and the completion of trial

DFPS submitted another permanency report in March 2018—now almost three years after the incident. It stated that Javier had pleaded guilty to the offense of injury to a child and had received 10 years' community supervision. It further stated that, after the guilty plea, Monica had participated in a video call with Javier during one of her supervised visits with the children. In DFPS's view, her participation in the call "diminishe[d] her protective capacities." In May, DFPS filed another report with the trial court that elaborated on the video call. According

---

[8]  We did not locate a court order in the appellate record that forbids Monica from contact with Javier.

12

to DFPS, during the call, Monica told the boys to "blow kisses" to Javier. DFPS also alleged that Monica had "allowed [Javier] in her home."

DFPS's reports stated that Monica had completed her family service plan, including parenting classes and therapy. They further stated that Monica lived "in her own apartment" and had provided DFPS with "a copy of her lease agreement. Nonetheless, according to the DFPS reports, Monica continued to lack protective capacities. The DPFS reports also were critical of Monica's continued contact with Javier and, on that basis, recommended termination of Monica's parental rights under Subsection (O).

DFPS later amended its petition and sought termination of Monica's parental rights to both boys on four bases: Subsection (D) (endangering conditions), (E) (endangering conduct), (N) (constructive abandonment), and (O) (failure to comply with court order). *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (N), (O).

On May 24, 2018—two and one-half years after DFPS was named managing conservator of the children—the last three trial witnesses testified.[9] J. Leal testified that she had replaced Jenkins as the DFPS caseworker in October 2017. She testified that Monica was continuing to describe Andres's injuries as an accident and to defend Javier by describing his conduct as not intentional.

---

[9]    *See infra* n.7.

Leal confirmed there had been only two known incidents of contact between Monica and Javier since the case had begun three years earlier: the March 2016 fence-jumping incident and the February 2017 video call. From these events, Leal expressed a belief that Monica was continuing to have contact with Javier, who, by the time of trial, had been deported.

Leal further testified that Monica was no longer living in the apartment she previously rented. She had moved out earlier that month and moved in with a cousin. Leal asserted that Monica had never been the named lessee where she lived during the pendency of the suit.

Leal testified that termination of Monica's parental rights was in the children's best interest because, "within time frames, Mom is not able to protect the children from the father," "she still believes that the incident was an accident," and she is not "able to have stable housing." Leal testified that this evidence indicated that Monica could not "provide basic needs for the children."

Leal testified that the single-parent foster placement, in contrast, had "always been on top of" the children's needs and that the foster parent was well bonded with the children. Leal testified that the foster placement was effectively dealing with the children's emotional reactions to visits with Monica, which she described as Jorge expressing a desire not to visit with Monica and Andres having post-visit nightmares. Leal testified that it would be "very detrimental for the boys"

to leave their then-current foster home because they were "very bonded" to their caregiver and "thriving."

The Child Advocates representative, Gonzalez, testified next. In his view, Monica had not been truthful about her contact with Javier. On the day he observed Javier jumping the fence, Monica told him that Javier had been at her home only 15 minutes, but Javier told him that he had been there for three hours.

Gonzalez testified that termination of Monica's parental rights was in the children's best interest because of Monica's lack of protective capacity. He explained that Monica had never been able to effectively answer his question of how she might identify whether a future partner was abusing her children.

Monica was the last trial witness. She requested that pictures be admitted from one of her supervised visits with the boys. The pictures were admitted; they show various bruises and marks on the boys' bodies. Monica said that the boys appeared to have been "beaten" while in DPFS's care. She could not provide an exact date the pictures were taken, and there were no follow up questions of any witnesses about the photographs or the injuries depicted. However, we note that an earlier DFPS report stated that the children had been moved from a foster home based on non-specific "allegations."

Monica testified that she had had no contact with Javier since the single video call. She said that she answered Javier's call that day because she thought he

was calling to say goodbye before his deportation. She testified that it had been a "mistake" to accept his call. And she stated that she now knew to "always put the children first" and that she would protect them.

Monica was asked about her housing. She testified that she had recently moved in with a female cousin because her previous home had had a problem with its air conditioner. She offered a lease into evidence, but the trial court sustained DFPS's objection that the lease was irrelevant because Monica's name was not listed on it.

At the conclusion of trial, the court terminated the parental rights of both parents. The court found by clear and convincing evidence that Monica had met the grounds for termination under three predicates: Subsection (D) (endangering circumstances), Subsection (E) (endangering conduct), and Subsection (O) (failure to comply with a court order setting forth requirements for return of children). *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (O). The court also found by clear and convincing evidence that termination of Monica's parental rights was in the children's best interest. *See id.* § 161.001(b)(2).

Monica appealed.

## Termination of Monica's Parental Rights

Monica challenges the legal and factual sufficiency of all predicate findings and the best interest finding.

16

## A. Standard of review

A parent's rights to the "companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). A termination decree is final, irrevocable, and permanently divests the parent of all legal rights, privileges, duties, and powers with respect to the parent-child relationship except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Id.* However, "the rights of natural parents are not absolute" and "the rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that parents may forfeit their parental rights by their acts or omissions, the primary focus of any termination suit is protection of the child's best interest. *Id.*

Due to the severity and permanency of the termination of parental rights, the State must prove its case by clear and convincing evidence. *See* TEX. FAM. CODE. § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. This is an

intermediate standard that falls between "preponderance of the evidence" used in ordinary civil proceedings and "reasonable doubt" used in criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

This heightened burden of proof results in a heightened standard of review. *In re S.R.*, 452 S.W.3d 351, 358 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Under this heightened standard, the "distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, No. 17-0477, 2018 WL 5304691, at *4 (Tex. Sept. 10, 2018). When the legal sufficiency of the evidence supporting the termination of parental rights is challenged, "the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *Id.* Evidence is legally sufficient if, viewing the disputed and undisputed evidence in this manner, "a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.*; *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *In re J.F.C.*, 96 S.W.3d at 265–66. If, after conducting a legal sufficiency review of the record evidence, the court determines that no reasonable factfinder could have formed a firm belief or conviction that the matter to be proved was true, the court must conclude that the evidence on that matter is legally insufficient. *In re J.O.A.*, 283 S.W.3d at 344–45; *In re J.F.C.*, 96 S.W.3d at 266.

The reviewing court does not assume the factfinder resolved all disputed facts in favor of its finding during a factual-sufficiency review; instead, the reviewing court weighs the disputed evidence. *In re A.C.*, 2018 WL 5304691, at *4; *see In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266. "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *In re A.C.*, 2018 WL 5304691, at *4. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

A single predicate finding under Section 161.001(b)(1) of the Family Code is sufficient to support a judgment of termination when there is also a finding that

termination is in the child's best interest. *In re A.V.*, 113 S.W.3d at 362. Thus, if multiple predicate grounds are found by the trial court, we will affirm on any one ground because only one is necessary for termination of parental rights. *See In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

**B.     Subsection (E) predicate finding on child endangerment by conduct**

Section 161.001(b)(1)(E) of the Family Code provides that parental rights may be terminated if the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Within the context of Subsection (E), endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *Id.*; *see In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

It is not necessary to establish that a parent intended to endanger a child to support termination under subsection (E). *See In re M.C.*, 917 S.W.2d at 270. Nor is it necessary to establish that the parent's conduct was directed at the child or caused actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being. *See Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312

20

S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The endangering conduct does not have to occur in the child's presence. *Id.* The conduct may occur before the child's birth and either before or after the child's removal by DFPS. *Id.* A parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *See In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

DFPS argues that Monica engaged in endangering conduct when she failed to obtain medical attention for Andres between the first incident, on April 17, 2015, when he stopped breathing, and the second incident two days later. Monica makes several arguments in response. First, she argues that there is no evidence Javier had a history of violence or aggression that would have reasonably supported any suspicion that Javier might have harmed the children if left in his care. Nor, she argues, is there any evidence that he or she had ever harmed the children. Second, she argues that all evidence indicates she had been at work when Javier shook Andres, Javier had lied to her about harming Andres, and Andres had appeared to be in good health when she and Celia saw him later that day.

21

But there also is evidence that Javier called Monica at work at 11:00 a.m. on the day Andres was injured and told her that Andres had stopped breathing, turned purple, and required CPR to begin breathing again. Officer Andrade's notes from his interview of Monica on April 20, 2015 recount her description of Javier's statements during their call. Monica told Andrade that Javier had said that Andres "could not breath or cry and became purple and pale." Javier also had told her that he had performed CPR on Andres to get him to begin breathing again.

Andres was two months old when this event occurred. By her own description of Javier's phone call, Monica understood that Andres had stopped breathing long enough to turn purple and required CPR intervention to regain necessary respiration. Despite knowledge of these serious developments, Monica did not take Andres to the local hospital, urgent care facility, or the medical office of his pediatrician, Dr. Rizvi, for evaluation.

A reasonable factfinder could have formed a firm belief that a reasonable parent would have obtained medical care for an infant who had stopped breathing and required CPR to be revived.[10]

---

[10] Cardiopulmonary resuscitation is an emergency medical technique used when someone's breathing or heartbeat has stopped. The record indicates that Javier was familiar with CPR because he had performed it on Jorge at some point in the past. The record is silent on the extent of Monica's knowledge of CPR or the proper medical care that should follow its use. "Basic" first aid instruction requires that a CPR trained rescuer call 911 for emergency assistance within two minutes of beginning CPR. *See, e.g.*, https://www.mayoclinic.org/first-aid/first-aid-cpr/basics/

The failure to provide appropriate medical care for a child may constitute endangering conduct under Subsection (E). *See In re J.I.G*, No. 01-18-00023-CV, 2018 WL 3233874, at *8 (Tex. App.—Houston [1st Dist.] July 3, 2018, no pet.) (mem. op.) (concluding that parent's "failure to provide appropriate medical care constituted endangering conduct for purposes of subsection E"); *In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981, at *13 (Tex. App.—Houston [1st Dist.] April 6, 2018, pet. denied) (mem. op.); *Smith v. Tex. Dep't of Fam. & Protective Servs.*, No. 01-09-00173-CV, 2009 WL 4359267, at *8 (Tex. App.—Houston [1st Dist.] Dec. 3, 2009, no pet.) (mem. op.); *Wyatt v. Dep't of Fam. & Protective Servs.*, 193 S.W.3d 61, 68 (Tex. App.—Houston [1st Dist.] 2006, no pet.). This is true even if the parent did not cause the need for the medical treatment. *Smith*, 2009 WL 4359267, at *7.

Thus, a reasonable factfinder could have formed a firm belief that Monica's failure to obtain a medical evaluation or any medical care for her infant son, whom she had been told had stopped breathing, met the standard for endangering conduct, even if the factfinder accepted that Monica did not know what caused Andres to stop breathing. *See Wyatt*, 193 S.W.3d at 68 (concluding that medical

art-20056600. Monica did not pursue any medical care for two-month-old Andres until two days later, after Javier reported that Andres had stopped breathing again.

23

neglect supported finding of endangerment of physical and emotional well-being of child).

Because the record contains legally and factually sufficient evidence to support the trial court's predicate finding under Subsection (E), we overrule Monica's second issue. Because we have concluded there was sufficient evidence to support the Subsection (E) finding, we do not reach Monica's challenge to the trial court's findings under Subsections (D) and (O).[11] We turn next to the best interest finding.

## C.    Best interest finding

In addition to a predicate violation, DFPS must establish by clear and convincing evidence that termination is in the child's best interest. TEX. FAM. CODE § 161.001(b)(2). There is a strong presumption that the child's best interest will be served by preserving the parent-child relationship. *In re J.F.C.*, 96 S.W.3d at 294; *see* TEX. FAM. CODE § 153.131(b). Because of the strong presumption that maintaining the parent-child relationship is in the child's best interest and the due process implications of terminating a parent's rights without clear and convincing evidence that termination is in the child's best interest, "the best interest standard

---

[11]    Because we did not reach the issue challenging termination under Subsection (O), we also do not reach Monica's fourth issue challenging the trial court's ruling to exclude evidence related to that basis for termination, i.e., the lease Monica attempted to admit into evidence to demonstrate she had appropriate housing, or Monica's fifth issue, raising a defense to termination under Subsection (O).

does not permit termination merely because a child might be better off living elsewhere. Termination should not be used to merely reallocate children to better and more prosperous parents." *In re W.C.*, 98 S.W.3d 753, 758 (Tex. App.—Fort Worth 2003, no pet.); *see In re E.N.C.*, 384 S.W.3d 796, 809 (Tex. 2012).

A factfinder may consider a number of factors to determine the child's best interest, including the child's desires, the child's present and future physical and emotional needs, the present and future emotional and physical danger to the child, the parental abilities of the people seeking custody, programs available to assist those people in promoting the child's best interest, plans for the child by those people or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

The absence of evidence on some factors does not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The absence of evidence cannot be used as if it were clear and convincing evidence supporting a termination finding. *In re E.N.C.*, 384 S.W.3d at 808. In some cases, undisputed evidence of only one factor may be sufficient to support a finding that termination is in the child's best interest; in other cases, there could be "more complex facts in which

25

paltry evidence relevant to each consideration mentioned in Holley would not suffice" to support termination. *Id.* Our "best interest" analysis is not limited to these Holley factors; other factors may be considered. *Holley*, 544 S.W.2d 372.

"A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*

### 1. Children's desires

DFPS caseworker Leal testified that the children experienced negative emotional reactions related to their visits with Monica. Jorge verbally expressed that he did not want to visit Monica. Andres would experience nightmares after his visits. These children are young, and their desires have not been clearly expressed; however, this evidence tends to indicate that the children do not hold a desire to return to their mother's care.

### 2. Children's present and future physical and emotional needs and danger

An October 2015 DFPS report states that Jorge had developmental delays when he first entered DFPS care. He was nonverbal and did not exhibit age-appropriate motor skills. These delays may have been related, to an extent, to Jorge's premature birth, but a November 2016 DFPS report states that Jorge had

26

shown notable improvement with intervention and therapy, especially after moving to his second foster home. There is also evidence Jorge would benefit from continued therapies. Likewise, Andres will require continued medical management related to his diagnosis of Shaken Baby Syndrome and related epileptic seizure activity.

The degree to which Jorge improved while in DFPS's care and receiving therapy would support a rational factfinder's determination that Jorge's physical needs were not being fully met before he entered DFPS care. Further, a rational factfinder could have reasonably determined that Monica's past inability to meet Jorge's developmental needs is indicative of her inability to provide for his physical developmental needs in the future. *See In re J.M.T.*, 519 S.W.3d 258, 271 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (considering special needs of child and evidence foster parent was actively meeting those needs in best-interest analysis).

### 3. Parenting abilities of people seeking custody

There is evidence that Monica failed to realize the seriousness of an infant's turning purple and requiring CPR. Further, there was evidence indicating that Jorge's developmental delays were not being adequately addressed before DFPS's involvement and the implementation of various therapies.

Leal testified that the then-current foster placement wanted to become a permanent placement for Jorge and Andres. Leal said that the foster care provider had "always been on top of" the children's medical and emotional needs. Additionally, she was well bonded with the children. In Leal's professional opinion, it would have been "very detrimental for the boys" to leave her care, where they had been "thriving."

### 4. Available programs for conservators to promote best interest of children

Monica successfully completed the programs DFPS required of her. This demonstrates a willingness to accept opportunities to develop parenting skills and address therapeutic needs. *See In re J.I.T.*, No. 01-17-00988-CV, 2018 WL 3131158, at *20 (Tex. App.—Houston [1st Dist.] June 27, 2018, no pet. h.) (mem. op.).

### 5. Monica's and DFPS's plans for the children

Monica's testimony was brief on this topic. She stated that she lived with her cousin in her cousin's apartment and, if the children were returned to her, her cousin "can rent this apartment to me." She did not testify about the children's futures beyond meeting their basic housing needs.

DFPS caseworkers testified that the boys' foster placement wanted to be a permanent placement for the boys. It is unclear if this testimony signaled that the placement would seek to adopt the boys or only that she would permanently foster

28

the boys. Regardless, the DFPS caseworker testified that it anticipated the placement would be permanent. Further, according to the DFPS caseworker, the foster placement had achieved a well-bonded relationship with the children, was meeting their needs, and was providing an environment that allowed them to thrive. This foster placement offered the ability to provide a safe, permanent home for the boys.

### 6. Monica's acts or omissions that may indicate that the existing parent-child relationship is not a proper one and any excuse for those acts or omissions

Monica's failure to appreciate Andres's urgent need for medical care when, at only two months of age, he had stopped breathing, is evidence indicating that the parent-child relationship was not a proper one. *See In re J.S.G.*, No 14-08-00754-CV, 2009 WL 1311986, at *9–10 (Tex. App.—Houston [14th Dist.] May 7, 2009, no pet.) (mem. op.) (determining that medical neglect of child supported conclusion that termination was in best interest of child). Further, the status of Jorge's developmental delays while under her care compared to his improvements after transitioning to foster care, further suggests that the parent-child relationship was not proper because she was not fully providing for his needs.

Monica relies on evidence that Javier lied to her about how Andres was injured and on the lack of evidence indicating that Javier had ever injured either boy in the past or had engaged in any act of family violence. She argues that,

29

combined, these reasonably support her acceptance of Javier's initial explanation of what had occurred while Andres was in his care. But Monica admitted to Andrade that Javier had told her by phone that Andres had stopped breathing, turned purple, and required CPR. Even if Monica was reasonable in initially believing Javier's explanation of events, that does not negate the obvious need for medical evaluation following an episode of infant CPR. A reasonable factfinder could conclude that Monica's understanding of the reason Andres stopped breathing did not excuse her failure to obtain medical care for him.

### 7. Conclusion on best interests

All but one of these *Holley* factors weighs, at least marginally, in DFPS's favor. After weighing the evidence as it relates to the *Holley* factors, we conclude there is legally and factually sufficient clear and convincing evidence to support the trial court's best interest finding in favor of termination. Therefore, we overrule Monica's sixth issue. Having overruled her second issue with regard to the trial court's findings under Subsection 161.001(b)(1)(E) and this issue on best interests, we affirm the trial court's decree terminating Monica's parental rights to Jorge and Andres.

## D.    Conservatorship in light of termination

In her seventh issue, Monica argues that there was legally and factually insufficient evidence to support the trial court's order appointing DFPS as managing conservator of the children.

When the parental rights of all living parents of a child are terminated, the trial court must appoint a "competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a); *see In re D.K.W., Jr.*, No. 01-17-00622-CV, 2017 WL 6520439, at *5 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.). Conservatorship determinations are reviewed for an abuse of discretion and will be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

An order terminating the parent-child relationship divests a parent of legal rights and duties with respect to the child. *See* TEX. FAM. CODE § 161.206(b). Once we overrule a parent's challenge to an order terminating her parental rights, the trial court's appointment of DFPS as sole managing conservator may be considered a "consequence of the termination." *In re D.K.W., Jr.*, 2017 WL 6520439, at *5 (quoting *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)).

31

Because we have overruled Monica's challenge to the portion of the trial court's order terminating her parental rights, the order has divested Monica of her legal rights and duties related to Jorge and Andres. *See* TEX. FAM. CODE § 161.206(b); *In re D.K.W., Jr.*, 2017 WL 6520439, at *5. Therefore, Monica does not have standing to challenge the portion of the order appointing DFPS as the boys' conservator. *Id.*; s*ee E.A. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-15-00811-CV, 2016 WL 1639847, at *4 (Tex. App.—Austin Apr. 21, 2016, pet. denied) (mem. op.) (affirming termination of mother's parental rights and holding that mother, who had been divested of her legal rights to child, could not challenge conservatorship determination). We overrule Monica's seventh issue.

## Conclusion

We have concluded that sufficient evidence supports the trial court's predicate finding under Subsection (E), best-interest finding, and order termination of Monica's parental rights. Because the termination of Monica's parental rights is upheld, she does not have standing to challenge the designation of DFPS as the children's managing conservator.

Therefore, we affirm.


Harvey Brown
Justice

32

Panel consists of Justices Keyes, Massengale, and Brown.

Justice Brown, concurring, joined by Justice Keyes.