**Opinion issued May 28, 2026**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-25-00999-CV

_____

## IN THE INTEREST OF K.L.B., A CHILD

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-02375J**

---

## MEMORANDUM OPINION

This accelerated appeal arises from a suit brought by the Texas Department

of Family and Protective Services ("DFPS") to terminate a parent-child relationship.

After a bench trial, the trial court terminated the parental rights of C.A.A. ("Mother")

to her minor child, "Katie"[1] based on its findings that she engaged in the endangerment grounds for termination[2] and that termination of the parent-child relationship was in Katie's best interest.[3]

Mother challenges the trial court's ruling in four issues, contending the evidence is legally and factually insufficient to support the trial court's findings supporting the termination of Mother's parental rights and that the trial court erred in appointing DFPS as Katie's sole managing conservator.

We affirm.

## Background

In June 2022, Katie was born prematurely at 30 weeks. She weighed less than three pounds at birth. After two and a half months in neonatal intensive care, she went home with her parents.

Katie lived with Mother, Father, Father's three older children, and Father's mother. The mother of the three older children was not involved in their lives.

Because of her prematurity, Katie needed regular follow up care and supplemental nutrition. But Katie missed several medical appointments. And at

---

[1] We use aliases for the child and her siblings to protect their identity. *See* TEX. R. APP. P. 9.8(b)(2).

[2] *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (b)(2).

[3] The trial court also terminated the rights of Katie's father, who did not appear for trial. *See id.* § 161.002.

some point, Katie stopped receiving the nutritional supplements that she had been prescribed.

During a visit in February 2024, Katie's maternal grandmother and maternal aunt noticed that Katie was much smaller than other children her age and was refusing to eat. They urged Mother to take Katie for medical care; Mother took Katie to a pediatric medical office. From there, they were sent by ambulance to a pediatric hospital emergency center. Katie was admitted for treatment of failure to thrive, microcephaly, developmental regression, and hypothermia. Mother shared Katie's diet history, but the amount and variety of foods that Mother reported were not consistent with Katie's diagnosis of severe chronic malnutrition.

At the time Katie was hospitalized, Mother was using marijuana for about an hour a day. Mother has used marijuana since she was about sixteen years old.

Katie underwent multiple medical assessments to determine whether there was a genetic or other cause for her failure to meet developmental targets. Ultimately, medical professionals determined that there was nothing physically wrong with her that would have caused her condition.

Katie's week-long hospital stay led to a referral to DFPS alleging medical and physical neglect of Katie. In May 2024, DFPS put a safety plan in place for Father's mother to ensure that Katie attended all doctor appointments and continued to gain weight. Mother was referred to Family Based Safety Services (FBSS).

3

In July 2024, Mother tested positive for marijuana and marijuana metabolites. Both Mother and Father participated in substance abuse services through FBSS.

The same month, DFPS received reports that Penny, Father's then five-year-old daughter, was seen with bruises on her face and forehead. When interviewed, Penny stated that Father hit her with a stick. The investigator observed that Penny had bruises around her right eye, on her foot, and on her abdomen under her ribcage.

Mother did not report Penny's injuries and did not believe that Father caused them. Mother and Katie continued to live with Father.

In October 2024, DFPS received a report that Penny was brought to daycare with bruises on the side of her forehead and cheek. Penny told the investigator that Father hit her with a belt.[4] DFPS also had concerns that Father was smoking marijuana around the children. And it suspected Father was not acting in a protective manner toward Katie, which could have contributed to her failure to thrive. DFPS removed the children from the home.

The Family Service Plan (FSP) for Mother provided that as to employment, Mother needed a realistic education and job skill plan, budget, and future plans to care and protect the child. She was to maintain stable employment for at least six consecutive months. Mother also was required to complete parenting classes and

---

[4]    At the time of trial, Father had an outstanding warrant for felony injury to a child. He did not participate in the services ordered by the court, did not visit the children while the case was pending, and did not appear for trial.

demonstrate and verbalize her ability to advocate for the child. Mother understood she was required to submit to drug testing on unannounced days and that if she failed to do so, DFPS would determine the result was positive. Mother was also expected to demonstrate the ability to provide a safe and stable home environment for Katie.

In May 2025, Mother underwent a chemical dependency assessment. She reported daily use of marijuana until December 2024 and was determined to have cannabis dependence. Mother was ordered to participate in substance abuse counseling but was discharged for lack of attendance.

Mother did not participate in parenting classes or submit to any drug testing as required under her FSP. Mother testified that on the days she was called to submit to drug testing, she would either have apartment tours or a job interview, which would take up most of her day.

During her psychosocial assessment in April 2025, Mother reported that she was still living with Father. By the time trial began in October 2025, though, Mother was no longer living with Father. She did not have her own apartment. Shortly before trial, Mother told the caseworker she was living with a friend but refused to provide her address, so the caseworker could not visit to see if it would be an appropriate environment for Katie. At trial, Mother first described the person she was living with as a friend and later as a romantic partner.

Mother was unemployed. She did not graduate from high school but hoped to get a general equivalency diploma. The DFPS caseworker testified that she helped Mother get her state identification card and gave her contact information for potential employers. Mother told the caseworker that she could not attend parenting classes because she was trying to find work. But the caseworker believed that Mother had not made any effort to apply for employment.

Katie was placed in a foster home along with her half-sister Molly, who was about a year older than Katie. The foster mother testified that when Katie first arrived, she was about two and a half years old but was not walking or speaking, only crawling and babbling. And Katie was very petite; she wore clothing sized for children who were 12-18 months old.

Katie has made "tremendous progress" in her foster placement and was thriving. She was in physical therapy, occupational therapy, and speech therapy. She was walking and could go up and down stairs by herself. She was speaking in three- to four-word sentences and could ask questions.

The foster mother noted that all the genetic and other medical testing done when Katie was diagnosed with failure to thrive came back normal, ruling out any hidden cause for the condition. The foster mother also stated that she intended to adopt Katie and her sister.

**Termination Grounds**

In her first three issues, Mother asserts that the evidence is legally and factually insufficient to support the trial court's findings that she engaged in the endangerment grounds and that termination of her parental rights was in Katie's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (b)(2).

**A.    Standard of Review**

The natural right existing between a parent and child is of constitutional dimensions, frequently characterized as far more precious than any property right. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Accordingly, a parent has a commanding interest in the accuracy and justice of the decision to terminate his or her parental status. *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). Thus, we strictly scrutinize termination proceedings and construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20.

At the same time, a parent may forfeit his or her parental rights based on his actions or omissions. *In re J.D.G.*, 570 S.W.3d 839, 850 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Parental rights are accorded only to natural parents who are fit to accept the accompanying responsibilities. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Though a natural parent faces losing his or her highly protected parental rights in a termination proceeding, the State's primary focus is to protect the child's best interests. *Id.*

Because the burden of proof in termination proceedings is clear and convincing evidence, a heightened standard of review in an evidentiary challenge is required. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). Thus, under either legal sufficiency or factual sufficiency review, we determine whether the evidence is such that a trier of fact could have reasonably formed a firm belief or conviction that its finding was true. *Id.*; *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022). The "distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re J.D.G.*, 570 S.W.3d at 850.

In determining whether the legal sufficiency of the evidence supports the trial court's termination of parental rights, "we look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.W.*, 645 S.W.3d at 741 (internal quotations omitted). "However, we may not disregard undisputed facts that do not support the finding." *Id.* (internal quotations omitted). In conducting a factual-sufficiency review in this context, the evidence is factually insufficient if, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

Under these standards, the factfinder remains "the sole arbiter of the witnesses' credibility and demeanor." *In re J.W.*, 645 S.W.3d at 741. In a bench trial, the trial court, as factfinder, weighs the evidence and resolves evidentiary inconsistencies and conflicts. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

## B.    Applicable Law

Family Code Section 161.001(b) authorizes an "involuntary termination of parental rights if a court finds by clear and convincing evidence both that a parent engaged in one or more enumerated predicate grounds for termination and that termination is in the best interest of the child." *In re M.P.*, 639 S.W.3d 700, 701–02 (Tex. 2022); *see* TEX. FAM. CODE § 161.001(b)(1)(A)–(U), (b)(2). Generally, "[o]nly one predicate ground and a best interest finding are necessary for termination, so 'a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground.'" *In re M.P.*, 639 S.W.3d at 702 (quoting *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019)).

Although only one predicate ground is necessary to support a judgment of termination, we may not bypass evidentiary challenges to subsections 161.001(b)(1)(D) and (E)—"the so-called endangerment grounds." *In re J.W.*, 645 S.W.3d at 748. "Those grounds bear special significance because termination of a

parent's rights under either can serve as a ground for termination of his [or her] rights to *another* child." *Id.*; *see* TEX. FAM. CODE § 161.001(b)(1)(M).

Because prior termination for endangerment provides a sufficient basis for a future termination, due process and due course of law require us to detail our analysis if we affirm the termination under either subsection 161.001(b)(1)(D) or (E). *In re N.G.,* 577 S.W.3d at 237.

## C. Endangerment Findings

"'To endanger' means to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *Jordan v. Dossey,* 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Though "endanger" means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," the conduct need not be directed at the child, and the child does not need to suffer injury. *In re J.W.*, 645 S.W.3d at 748.

### 1. Section 161.001(b)(1)(D)

Family Code section 161.001(b)(1)(D) authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional wellbeing of the child[.]" TEX. FAM. CODE § 161.001(b)(1)(D).

The endangerment analysis under subsection (D) focuses on the evidence of the child's physical environment but allows termination if DFPS proves the parent's conduct caused a child to be placed or remain in an "endangering environment." *Jordan*, 325 S.W.3d at 721.

The endangering "conditions or surroundings" include "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home . . . ." *Id.* Subsection D allows termination based on a single act or omission. *Id.*

## 2.      Section 161.001(b)(1)(E)

Family Code section 161.001(b)(1)(E) authorizes a trial court to order termination of a parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" TEX. FAM. CODE § 161.001(b)(1)(E). Under subsection (E), DFPS must prove that the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child, rather than a single endangering act or omission, as permitted by subsection (D). *Jordan*, 325 S.W.3d at 723.

"A child is endangered if his environment creates a potential for danger that the parent disregards." *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). "Conduct that subjects a child to life of uncertainty and

11

instability endangers the child's physical and emotional well-being." *Jordan*, 325 S.W.3d at 723.

Danger to the child's well-being may be inferred from parental misconduct standing alone, and endangering conduct need not be directed toward the child. *Id.*; *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021). Evidence of violence and physical abuse directed toward one child in the home supports termination of parental rights as to the other children. *See In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *16 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.).

"[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345. "A reviewing court should not evaluate drug-use evidence in isolation; rather, it should consider additional evidence that a factfinder could reasonably credit that demonstrates that illegal drug use presents a risk to the parent's 'ability to parent.'" *In re R.R.A.*, 687 S.W.3d at 278.

### 3. Analysis

Father's physical abuse of Penny and Mother's lack of protective response to the abuse supports the endangerment findings. Parental conduct that presents a substantial risk of harm to the child allows a factfinder to reasonably find endangerment. *See In re R.R.A.*, 687 S.W.3d at 278. "[A] parent's continued association with a known abuser is a conscious choice that endangers a child's

physical and emotional wellbeing because it exposes the child to the possibility of violence." *In re D.D.D.*, No. 01-23-00078-CV, 2023 WL 4872399, at *11 (Tex. App.—Houston [1st Dist.] Aug. 1, 2023, no pet.) (mem. op.) (internal quotation omitted).

Mother and Katie continued to live with Father after the abuse occurred. Mother claimed that she only saw Father hit Penny on her bottom or hand. When asked if she believed that Father was physically abusing Penny, Mother testified, "I don't—but—I do." Mother reiterated that she had never seen the abuse, yet the bruising on Penny's face was visible to the daycare workers and the DFPS investigator. The investigator's photos of Penny's face are also in the record.

The evidence also shows parental neglect of Katie. Mother missed some of Katie's medical appointments, and when Katie's grandmother and aunt saw Katie, she was alarmingly small and refusing to eat. Yet Mother did not seek medical attention for Katie until urged to do so by others. When Mother finally brought Katie to the doctor, Katie was taken by ambulance to a hospital for treatment of severe malnutrition. Katie was diagnosed with failure to thrive and had delays in her speech and physical development that were not attributable to any genetic or medical condition.

Mother admitted that she was using marijuana for about an hour every day until Katie's February 2024 diagnosis of failure to thrive. A factfinder could

reasonably infer that Mother's apparent inattention to Katie's physical needs was related to her frequent marijuana use. *See In re R.R.A.*, 687 S.W.3d 269, 279–80 (Tex. 2024).

According to Mother, she stopped using marijuana after Katie's hospitalization. Yet Mother tested positive for marijuana during the FBSS period, after Katie went home from the hospital. And in the substance abuse assessment required by the FSP, Mother stated that she did not stop using marijuana until several months later, in December 2024.

Mother claimed she no longer used marijuana, but the trial court did not need to credit her testimony on that issue. The FSP states that Mother understood that if she failed to submit a specimen for testing on the specified day, her failure would result in a determination that the result was positive. Mother did not submit to any drug testing during the FSP period. Under the circumstances, the trial court could properly presume that her refusal to submit to random drug testing it ordered meant that she would have tested positive. *See In re R.R.A.*, 687 S.W.3d at 281; *In re J.M.T.*, 519 S.W.3d 258, 269 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

The evidence of Mother's heavy marijuana use, the events that led to Katie's hospitalization, and Katie's diagnosis and treatment is legally and factually sufficient to support the finding that Mother engaged in a course of conduct that endangered Katie's physical and emotional well-being.

**D.     Best Interest**

Mother also contends that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in Katie's best interest.

The best interest prong focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Several nonexclusive factors guide the factfinder's best-interest determination, including: (1) the child's emotional and physical needs; (2) present and future physical and emotional danger to the child; (3) the parental abilities of the individuals seeking custody; (4) those individuals' plans for the child and the stability of the home; (5) the plans for the child by the agency seeking custody and the stability of the proposed placement; (6) the parent's acts or omissions that may suggest the existing parent-child relationship is improper; and (7) any excuse for the parent's acts or omissions. *Id.* (the "*Holley* factors," citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). We may also consider the statutory factors set forth in Family Code section 263.307. *See* TEX. FAM. CODE § 263.307; *In re A.C.*, 560 S.W.3d at 631 n.29. Proof of each of these considerations is not a condition precedent to termination. *In re C.H.*, 89 S.W.3d at 27. The analysis may include direct and circumstantial evidence, the totality of the evidence, and subjective factors. *In re J.M.T.,* 519 S.W.3d at 269.

Several factors support the trial court's finding that termination of Mother's parental rights is in Katie's best interest.

The evidence does not show that Mother has acquired the parenting skills necessary for Katie to thrive in her care. After Katie's release from the hospital, Mother participated in FBSS and cared for Katie for about four months before DFPS removed the children from the home. Even though Katie was more than two years old at that time, she was still not walking or speaking, only crawling and babbling. And Katie was still very small.

During the FSP period, the DFPS caseworker testified that she went "above and beyond" for Mother to help her complete her FSP goals. The caseworker provided Mother with the information for the substance abuse assessment and parenting classes multiple times and followed up with her about attendance. Yet Mother did not participate in any of the FSP-ordered parenting classes to improve her ability to care for and protect Katie. Given the evidence that Katie endured serious neglect while in Mother's care, Mother's failure to work on her parenting skills shows that she continues to be a physical and emotional danger to the child.

In contrast, the foster mother has met Katie's needs. The foster mother testified that she placed Katie in physical therapy, occupational therapy, and speech therapy, and she reported that Katie had made "tremendous progress" and was thriving. Under the foster parent's care, Katie was gaining weight, walking and stair

climbing, and speaking in sentences. Factors (1), (2), and (3) thus support the finding that termination is in Katie's best interest.

The caseworker also helped Mother obtain a state identification card so she could apply for jobs. And the caseworker provided Mother with information about job opportunities and contact information for potential employers. Despite using job interviews and apartment viewings as excuses to miss drug testing appointments, counseling, and parenting classes, Mother did not have either employment or her own apartment.

Mother reported that she was living with a friend, whom she later described as a romantic partner. But she would not cooperate with DFPS's request to inspect the home to determine whether it was appropriate for Katie. "A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *9 (Tex. App.— Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.). No evidence supports a finding that Mother can provide Katie with a safe and stable home.

Katie was in the foster home with her half-sister, and the foster mother expressed her intent to adopt them. Katie's improvement in the foster mother's care also weighs against a best interest finding in Mother's favor.

Mother attended most of her scheduled visits with Katie. Mother believed that living with her was in Katie's best interest because Katie was her "soul," her "entire

heart." But Mother has not shown improvement in any of the behaviors and circumstances that led to Katie's removal in the first place. This evidence of Mother's emotional attachment to Katie, without more, does not support reversal of the trial court's best-interest finding.

We hold that legally and factually sufficient evidence supports the finding that that termination of Mother's parental rights is in Katie's best interest.

We overrule Mother's first, second, and third issues.

**Sole Managing Conservatorship**

In her fourth issue, Mother complains of the trial court's ruling appointing DFPS as Katie's sole managing conservator.

An order terminating the parent-child relationship divests a parent of legal rights and duties with respect to the child. *See* TEX. FAM. CODE § 161.206(b). Once we overrule a parents challenge to an order terminating her parental rights, the trial court's appointment of DFPS as sole managing conservator is a "consequence of the termination." *In re J.D.G.*, 570 S.W.3d at 856; *In re A.S.*, 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

Because Mother did not prevail on any issue she raised in her appeal that changed the portion of the trial court's order terminating her parental rights, the order divested Mother of her legal rights and duties related to Katie. *See* TEX. FAM. CODE § 161.206(b); *In re J.D.G.*, 570 S.W.3d at 856. As a result, Mother lacks standing to

challenge the portion of the order appointing DFPS as Katie's conservator. *See In re S.M.M.*, No. 01-22-00482-CV, 2022 WL 17981669, at *12 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op.); *In re J.D.G.*, 570 S.W.3d at 856.

We overrule Mother's fourth issue.

## Conclusion

We affirm the trial court's decree terminating the parent-child relationship between Mother and Katie.

Clint Morgan
Justice

Panel consists of Justices Gunn, Caughey, and Morgan.