

# IN THE
# TENTH COURT OF APPEALS

## No. 10-22-00425-CV

## IN THE INTEREST OF L.N., A CHILD

### From the 474th District Court
### McLennan County, Texas
### Trial Court No. 2021-2191-3

## MEMORANDUM OPINION

Mother and Father[1] appeal from a judgment that terminated their parental rights

to their child, L.N.[2]  *See* TEX. FAM. CODE § 161.001.  Mother complains that the evidence

was legally and factually insufficient for the trial court to have found that she committed

the predicate acts in Section 161.001(b)(1)(D) and (E) and that termination was in the best

interest of L.N.  Father complains that the evidence was legally and factually insufficient

for the trial court to have found he committed the predicate acts in Section

---

[1] We will use aliases for the parents and other children to protect the minors' identities. TEX. R. APP. P.
9.8(b)(2).
[2] The Department removed two children initially; however, the proceeding as to the older child, J.N., was
severed from this proceeding.

161.001(b)(1)(D), (E), (N), and (O), that the trial court erred by failing to find that his failure to comply with the service plan was not his fault, and that the evidence was legally insufficient for the trial court to find that termination was in the best interest of the child. Because we find that the evidence was legally and factually sufficient as to the evidence as to both Mother and Father on one ground in addition to best interest, we affirm the judgment of the trial court.

## STANDARD OF REVIEW

The standards of review for legal and factual sufficiency in cases involving the termination of parental rights are well established and will not be repeated here. *See In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency); *see also In re J.O.A.*, 283 S.W.3d 336, 344-45 Tex. 2009). If the evidence is sufficient as to one ground, it is not necessary to address other predicate grounds because sufficient evidence as to only one ground in addition to the best interest finding is necessary to affirm a termination judgment. *In re N.G.*, 577 S.W.3d 230, 232-33 (Tex. 2019).

## SECTION 161.001(b)(1)(E)

In part of Mother's first and second issues and Father's second issue, they complain that the evidence was legally and factually insufficient to support the trial court's finding pursuant to Subsection 161.001(b)(1)(E). Subsection (E) allows termination of parental rights if the trial court finds by clear and convincing evidence that the parent "engaged

in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). "Endanger" means "to expose a child to loss or injury, or to jeopardize a child's emotional or mental health." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam). An endangerment finding often involves physical endangerment, but it is not necessary to show that the parent's conduct was directed at the child or that the child suffered actual injury. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone." *Id*. Also, it is not necessary to establish that a parent intended to endanger a child in order to support termination of the parent-child relationship under subsection (E). *See In re M.C.*, 917 S.W.2d at 270.

"Endangerment can occur through both acts and omissions." *Phillips v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 348, 354 (Tex. App.—Austin 2000, no pet.). A parent's past endangering conduct may create an inference that the parent's past conduct may recur and further jeopardize a child's present or future physical or emotional well-being. *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

A parent's use of illegal drugs, and its effect on his or her ability to parent, may qualify as endangering conduct. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). As a general proposition, illegal drug use may support termination under subsection (E) because it exposes the child to the possibility that the parent may be impaired or

imprisoned. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617-18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Purchasing illegal drugs for a child that results in that child's arrest is certainly endangering conduct, and using illegal drugs with a child is endangering as well.

Additionally, a parent's criminal conduct and imprisonment are relevant to the question of whether the parent engaged in a course of conduct that endangered the well-being of the child. *In re S.R.*, 452 S.W.3d 351, 360-61 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533-34. Routinely subjecting a child to the probability the child will be left alone because his parent is in jail endangers the child's physical and emotional well-being. *In re S.M.*, 389 S.W.3d at 492.

Lastly, domestic violence and a propensity for violence may constitute evidence of endangerment pursuant to subsection (E). *In the Interest of A.M.R.*, 652 S.W.3d 117 (Tex. App.—Waco 2022, pet. denied).

**MOTHER**

The Department received a referral relating to Mother when law enforcement was investigating an allegation that her oldest son, Bob, had made threats that he was going to shoot up a school in Virginia shortly before Mother moved to Texas with three of her four children. One of her sons had remained in Virginia with Mother's parents. Mother

and the children had been in Texas for approximately three weeks prior to the referral. The children with Mother in Texas were Bob, age 17, Brad, age 15, and L.N., age 3.

During the investigation, a search of Mother's apartment was conducted pursuant to a warrant by local law enforcement and the U.S. Marshals. The search led to the discovery of a baggie of marihuana and a loaded semi-automatic rifle[3] in Bob's bedroom. Mother initially denied knowledge of the marihuana but later admitted that she had purchased it for Bob and that they smoked it together 2-3 times a week. The semi-automatic rifle was on the floor in the middle of Bob's unsecured bedroom where L.N. could have easily accessed it. Mother stated that the semi-automatic rifle was in Bob's room because he knew how to use it. Although he had never fired it, Mother testified that he had watched YouTube videos to learn about it. Mother told the investigator that she did not know that the semi-automatic rifle was loaded. Ammunition, gas masks, brass knuckles, and a hunting knife were also found in Bob's bedroom.

The semi-automatic rifle belonged to Mother's mother in Virginia. Mother stated that they took the weapon with them without her mother's knowledge from Virginia. Mother and Bob both testified that they brought the gun to Texas for safety reasons. Mother was unable to purchase a firearm in her own name because she was on probation in Virginia for making a false report on a gun application.

After the discovery of the marihuana, Mother was arrested for delivery of

---

[3] The semi-automatic rifle was referred to in the record as an AK-47.

marihuana, and Bob was arrested for possession of marihuana. Brad and L.N. were removed from Mother's custody and were placed in foster care. Brad was placed in an emergency shelter and then a facility similar to a residential treatment center. Brad was eventually placed back with Mother on a monitored return after being discharged from his placement for behavioral issues, which were thought to be because he wanted to return home. L.N. was placed in a foster home and potential adoptive placement where she remained until the time of trial.

During the pendency of this proceeding, Mother completed her service plan that was created by the Department. She participated in visits and tested negative for drugs on every test. Mother had a steady job, a vehicle, and an apartment. The apartment, while cluttered, was generally thought to be safe except for an airsoft gun, brass knuckles, a Swiss army knife, and a hunting knife that were kept in Bob's room which had a basic lock on the door and a hook latch on his closet door. The semi-automatic rifle had not been returned to them, so there were no firearms in the home. At the time of the last final trial setting, Bob was 19 years old. Bob and Brad were living in the apartment with Mother.

When we consider the evidence using the appropriate standards for reviewing the legal and factual sufficiency of the evidence, we find that the evidence was legally and factually sufficient for the trial court to have found by clear and convincing evidence that Mother engaged in conduct which endangered L.N.'s physical or emotional well-being.

Mother's purchase of illegal drugs for her minor child while on probation for another criminal offense that led to her arrest for delivery of illegal drugs and her child's arrest for possession of illegal drugs that she had provided, her admission of using illegal drugs that she had purchased with her minor child, and her disregard of any risk in her home with three-year-old L.N. having easy access to the loaded semi-automatic rifle that Mother was unlawfully in possession of constituted endangering conduct. We overrule Mother's first (legal sufficiency) and second (factual sufficiency) issues as related to subsection (E). We do not need to address the part of Mother's first and second issues relating to subsection (D).

**FATHER**

In his second issue, Father complains that the evidence was legally and factually insufficient for the trial court to have found that he engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child pursuant to Subsection (E). Father alleges that he was not involved in the actions of Mother that led to the removal of the children and was actually the person who made the referral. In his brief, he does not reference any evidence presented at trial relating to his own bad acts in relation to Mother and their other children.

Mother testified that when she was pregnant with Bob, on one occasion Father kidnapped her and choked her, which resulted in petechiae in her eyes. Brad testified

that he saw his parents fighting when he was younger and on one occasion, Mother had to use pepper spray to get away from Father. Mother, Bob, and Brad all testified that Father was abusive and that L.N. should never be placed in his home.

Mother testified that, in part, her move to Texas was made in an effort to get away from Father. Father had a history of depression and bipolar disorder, rendering him legally disabled. Father lived with his mother to ensure he remained on his medication. Father and Mother had extensive CPS history in Virginia beginning in 2006 and continuing until 2020 relating to Bob and Brad, which included a finding of physical neglect. Father testified that he never really participated in the CPS proceedings in Virginia except to support Mother. Father and Mother's parental rights to Brad were terminated at one point and reinstated, although the record is unclear as to how. During the proceedings, a protective order had been entered prohibiting Father from having any contact with Brad until Brad's 18th birthday.

Viewing the evidence by using the proper standards, we find that the evidence was legally and factually sufficient for the trial court to have found that Father engaged in conduct which was endangering to L.N.'s physical and emotional well-being. We overrule Father's second issue. Because we have found that the evidence was sufficient as to one predicate act, we need not address Father's first, third, fourth, or fifth issues.

## BEST INTEREST

In Mother's third issue and Father's sixth issue, Mother and Father complain that

the evidence was legally and factually insufficient to support the trial court's determination that termination was in the best interest of L.N. In determining the best interest of a child, a number of factors have been consistently considered which were set out in the Texas Supreme Court's opinion, *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). This list is not exhaustive, but simply lists factors that have been or could be pertinent in the best interest determination. *Id.* There is no requirement that all of these factors must be proved as a condition precedent to parental termination, and the absence of evidence about some factors does not preclude a factfinder from reasonably forming a strong conviction that termination is in the children's best interest. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Evidence relating to the predicate grounds under section 161.001(b)(1) also may be relevant to determining the best interest of the children. *See C.H.*, 89 S.W.3d at 27-28.

### FACTS RELATING TO MOTHER

Mother completed her service plan ordered by the trial court in its entirety. She maintained employment and had a stable residence and transportation. L.N. was bonded to Mother and her brothers. L.N. was especially close to her brother, Brad. Mother and her sons participated regularly in visits with L.N., even after L.N. moved to another county with her foster family during the proceedings. Mother tested negative on every drug test and no longer had a firearm in her apartment.

During various visits throughout the case, Mother demonstrated some

troublesome behaviors which were concerning to the Department and the ad litems. In earlier visits prior to his return home, Mother paid more attention to Brad than L.N. at the visits. After the CASA worker expressed his concern to Mother, Mother changed how she acted toward L.N. during the visits and became more attentive toward L.N. The visits were bi-weekly throughout the entire case. Mother, Bob, and Brad came to one visit in matching t-shirts that had a picture of L.N. on the front with the slogan "Free L.N." Additionally, at the last visit prior to the trial, Mother wanted to celebrate her (Mother's) birthday with the kids and asked the foster mother to provide a gift for L.N. to give to her mother. Mother brought cake and made the entire visit about herself and her birthday. She received a Starbuck's gift card and called the customer service number on the back of the card so she could find out how much the card was worth rather than visiting with L.N. even though it could have been her last visit with L.N. pending the outcome of the trial. When the kids, including L.N., were too loud for her to hear the answer, she yelled at them to quiet down and called the number again, taking 5-10 minutes of her visit time.

According to Mother, because the semi-automatic rifle had not been returned and she would not buy drugs for her children anymore, all issues surrounding her conduct were resolved once she completed the service plan. Initially she stated that Bob and Brad would care for L.N. while she was at work, but later she changed her story to the YMCA after school care program when confronted with concerns about Bob and Brad.

Mother was not forthcoming at any point about her CPS involvement in Virginia, so her service plan did not address any of the concerns from the prior removal of her children before L.N.'s birth. Brad had spent many years of his life in the custody of CPS and Mother's parents due to alleged abuse and neglect. Brad had been sexually assaulted at a very young age by a neighbor in Bob's presence. Over the years in a long-term sexual therapy center in Virginia after being removed from Mother's custody, Brad exhibited sexual behaviors that were not normal for his age. A psychosexual evaluation had been performed on Brad in Virginia. The evaluation demonstrated that Brad had knowledge of sexual behaviors that were not normal for a child of Brad's age unless he had experienced them. Mother did not believe that any of the allegations other than the first sexual assault by the neighbor were true. Mother denied that the court in Virginia had ever terminated her parental rights, but court orders were admitted into evidence establishing that her rights to Brad had been terminated twice, although it is not clear how her rights were reinstated after termination. Ultimately, the outcome of the last CPS case in Virginia was that Brad spent seven years out of Mother's custody, and the final order gave custody to Mother's mother.[4]

There were incidents involving Brad acting out while in an emergency shelter after

---

[4] The bulk of the records from the CPS case from Virginia were excluded from evidence because they had not been properly authenticated or produced in a form to be admissible into evidence. The records were procured in between settings of the final trial by the CASA worker who got them from an attorney in Virginia. The trial court admitted only the court orders that were marked as certified copies.

his removal in this proceeding and continued improper behavior in the facility where he was placed prior to his return to Mother. Brad would proposition other residents of the facility, get into fights, and then accuse the other residents of being the aggressor. He smeared feces on the wall of his room. Eventually, the Department agreed to return Brad on a monitored return to Mother. This took place prior to receiving the records from Virginia. Mother was convinced that Brad was the victim in the facility in Texas and that everything else was fabricated, including the allegations from Virginia. Mother testified that she knew that Brad had watched pornography on a laptop in her home because she did not have good parental controls on it, but was not concerned that Brad would ever be a danger to L.N., if for no other reason than the fact that all of the allegations surrounded sexual contact with other males, not females.

Prior to the removal, a picture had been taken of L.N. holding an unloaded semi-automatic rifle. Although Mother stated that there were no firearms in her home and would not be in the future, at a supervised visit with L.N., Mother showed L.N. a video of a semi-automatic rifle that had been painted with a butterfly on it and told L.N. that she could have one like it. Mother did not perceive any dangers with Bob possessing the brass knuckles or a hunting knife because they were kept in a closet that had a hook latch on it.

L.N. was bonded with her foster family, who wanted to adopt L.N. if possible. Although too young to be able to choose where she wanted to live on a permanent basis,

L.N. had indicated that she wanted to remain with her foster family. The foster family was able to provide for her needs, including therapy for acting out behaviors.

The CASA worker who was the guardian ad litem for L.N. testified that based off of his time spent during the case, the records he had reviewed, and his meetings with those involved with the case, he was concerned about L.N.'s safety if she were returned to Mother's home because Mother had been evasive and not forthcoming about the proceedings in Virginia, did not appear to recognize the seriousness of the issues that led to this removal, and refused to believe that Brad and potentially Bob had acted out sexually in an improper manner. The CASA worker testified that he believed that termination was in L.N.'s best interest, and that L.N. would be devastated regardless of the result of the proceeding.

## FACTS RELATING TO FATHER

Father "visited" with L.N. by supervised video calls throughout the proceedings; however, he did not express any interest in having L.N. placed with him. He had never paid child support for any of his children and was living with his mother due to his mental health conditions, which included depression and bipolar disorder. Both Bob and Brad expressed that Father's home was not a safe place for L.N. Father had a history of domestic violence against Mother and his older children while they were all living in Virginia, and Mother testified that one reason she had moved to Texas was to get away from Father, who was abusive. He had a protective order entered against him which

prevented him from having any contact with Brad due to Father's conduct.

Father made no attempt to work his service plan or to come to Texas to visit with the children. There was no evidence that he and L.N. had any kind of bond or that he had any interest in being any kind of parental figure in her life.

APPLICATION—BEST INTEREST

Viewing all of the evidence including the evidence listed above pursuant to the appropriate standards, including the *Holley* factors, we find that the evidence was legally and factually sufficient for the trial court to have found that termination of the parent child relationship between Mother, Father, and L.N. was in L.N.'s best interest. We overrule Mother's third issue and Father's sixth issue.

CONCLUSION

Having found no reversible error, we affirm the judgment of the trial court.


TOM GRAY
Chief Justice

Before Chief Justice Gray,
 Justice Johnson, and
 Justice Smith
Affirmed
Opinion delivered and filed June 7, 2023
[CV06]

