# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00608-CV

---

**S. S., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 146TH DISTRICT COURT OF BELL COUNTY**
**NO. 22DFAM332752, THE HONORABLE DALLAS SIMS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

S.S. (Mother) appeals from the trial court's decree of termination, following a bench trial, terminating her parental rights to her children, two-year-old Natalie and one-year-old Zane.[1]  In two issues, Mother argues that the evidence was legally and factually insufficient to support the trial court's endangerment and best-interest findings and that the trial court abused its discretion or erred by appointing the Texas Department of Family and Protective Services as the managing conservator of the children.  For the following reasons, we affirm the trial court's decree of termination.

---

[1]  To protect the children's privacy, we refer to them by pseudonyms, their parents by their initials or as Mother or Father, and other persons by their relationship to the children.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.  The decree of termination also terminates Father's parental rights to the children, but he did not appeal from the decree and is not a party on appeal.

## BACKGROUND

In June 2022, the Department received an intake for physical abuse of Zane. Mother and Father had taken two-month-old Zane to an appointment with his pediatrician, and the pediatrician referred them to the hospital because Zane's left leg was swollen. At the hospital, it was determined that Zane's leg was fractured and that he had bruising on his face and other healing fractures—"too many fractures to count"—to his legs, ribs, right arm, and spine. After Father admitted that he caused Zane's injuries, the Department sought and obtained emergency removal of the children from Mother and Father and filed a petition to terminate their parental rights. The trial court appointed the Department as the children's temporary managing conservator, and the children were placed with their maternal grandparents (Grandparents). When he was placed with Grandparents, Zane's fractured "leg was in a cast from his hip down to his toes," he was on "around the clock" pain medicine, and he continued to need pain medication throughout the case.

In November 2022, Grandparents intervened in the case, and the bench trial occurred over three days: June 1, June 15, and August 17, 2023. The trial court took judicial notice of its file, and the witnesses were the Department's family conservatorship specialist who had been assigned to the case beginning in December 2022, Mother, Father, Grandmother, and a licensed professional counselor who provided counseling services to Mother beginning in August 2022. The Department sought to have the parents' rights terminated, and its permanency plan for the children was adoption by Grandparents. The children had remained in Grandparents' care during the case, and the evidence showed that they were "thriving," "happy and healthy," "getting all their needs met," and "very bonded" to Grandparents. Grandparents hoped to adopt the children if the parents' rights were terminated. In their testimony, both

parents also agreed that the children should remain with Grandparents going forward but asked the court not to terminate their rights. Although Grandmother testified that she was asking for the trial court to allow supervised visitation for Mother through a third-party supervisor going forward, Mother testified that she did not believe that Grandmother would allow visitation if her rights were terminated and sought court-ordered visitation. Grandmother and Mother had not been directly communicating with each other during the case.

At the time of trial, criminal felony charges remained pending against Father from Zane's injuries,[2] and Mother was pregnant and living with the father of her unborn child who had a history of assaultive conduct.[3] Prior to living with the father of her unborn child, Mother admitted that she had been living with Father from September to December 2022 despite court orders prohibiting Father from having contact with her. There also was evidence that Mother attempted to hide their ongoing relationship during the case and that she had provided financial assistance to Father up until March 2023.[4]

The evidence was conflicting whether Mother was aware that Father was dangerous and a risk to the children when she left the children in his care. Mother testified that she was not aware, that Father took care of the children when she was at work from 8:00 a.m. to

---

[2] Charges against Mother from Zane's injuries remained under investigation, and she testified that she did not know if she would be charged.

[3] The individual's history of assaultive conduct occurred when he was a minor, thirteen years before the trial. Mother's due date was September 4, 2023.

[4] The evidence was conflicting concerning Mother's financial assistance to Father. The Department's representative testified that Mother paid Father's ankle monitor fee and phone bill up until March 2023, but Mother testified that she paid money to Father's mother to repay debt that she owed and that she did not know how the money was used. Father's ankle monitor was a bond condition concerning the criminal charges that were pending against him from Zane's injuries.

8:00 p.m. five days a week, and that Zane was injured when she was at work. In contrast, Grandmother testified that Mother knew Father was dangerous because Mother told her that he was and "that he had abused her" and that Mother moved in with Grandmother because of his abuse but that she and the children then went back to live with Father. Grandmother testified that Mother stayed with her from December 2021 to May 2022. Grandmother also testified that she did not believe that Mother could keep the children safe and explained her concerns:

> I have to say that she knew of his behavior and she had a safe place here with us and she elected to leave and placed the kids in harm. Out of selfishness she left and took them and this is where we are.

Prior to allowing Father to care for the children while she was working, Mother also admitted to calling 911 because of an altercation with Father and concern for her own safety, but she testified that the altercation was only verbal. Both Mother and Father denied physical violence with each other, but they acknowledged that they verbally argued, and Father testified that he sometimes threw things in the children's presence when he was arguing with Mother. Mother also testified that she knew Father had mental health issues and that she had been aware of his issues since "around the six-month mark of [their] relationship."

As to Zane's injuries, both parents testified that Mother was unaware that Father had injured Zane until they took him to the doctor in June 2022 because the injuries occurred when Father was taking care of the children and she was at work. Mother agreed that when she was asked at the hospital how Zane had sustained his injuries, she answered that Natalie fell on him due to jumping on the bed. She also testified that she did not have any idea that anything was wrong with Zane prior to taking him to the doctor in June. But Mother agreed with the description in the Department's removal affidavit as to the severity of Zane's injuries (1) "tibia,

4

fibula and femur fracture to that leg"; (2) "healing fractures on both legs, ribs, right arm, left scapular spine fracture"; (3) bruises, and (4) "too many fractures to count." Based on Zane's injuries, the conservatorship specialist testified that Mother allowed Zane's injuries to happen over time without doing anything about them.

The exhibits at trial included the removal affidavit; Mother's family service plan; an approved homestudy on Grandparents; an October 2022 report of the psychological evaluation of Mother, which concluded that she suffered from depression, postpartum depression, and bipolar disorder;[5] and notes from Mother's counselor who had provided services to Mother from August 2022 to the time of trial. The counselor testified that Mother had matured, grown, and had a better capacity to be a protective parent. He did not advocate for her to be the children's primary caregiver but that her rights not be terminated and that she be allowed visitation. The counselor, however, agreed that Mother had been deceitful with him, including about being around Father for the first few months that he was counseling her, and expressed concern about Mother's continued financial support of Father because "that would tell [him] that, there, perhaps, was some kind of relationship ongoing." He also testified to the possibility that Mother might revert to her prior conduct after the case was over.

As to Mother's service plan, the Department's representative testified that for the first six months of the case, she "wasn't doing much at all in the case" but that she eventually complied with most of the plan. Mother remained in contact with the Department, obtained and maintained employment, participated in therapy, and participated in supervised visits with the children. Mother also testified that she was taking medicine to address her mental health issues

_____

[5] The report also concluded that Mother did not appear to be a "suitable independent parental resource" due to "many areas of dysfunction" and that these "significant concerns must be further addressed prior to the contemplation of reunification."

and had paid $1,500 to Grandparents during the case.  Mother agreed that she was not in position to have the children live with her but testified that she had been employed during the case, would be allowed to return to her current employment after giving birth to her unborn child, and was in the process of finding an apartment.  Mother had been evicted from her apartment and was staying with the father of her unborn child in a three-bedroom home with two other roommates.  Mother also testified that prior to the psychological examination, she had lived in seven different homes in the last five years, including being homeless for three months, living in a car for six months, and a hotel for four months.

At the conclusion of the evidence, the guardian ad litem advised the trial court that it was in the children's best interest to terminate the parents' rights so that Grandparents could move forward with adoption.

In the decree of termination, the trial court found by clear and convincing evidence that Mother had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being, *see* Tex. Fam. Code § 161.001(b)(1)(D); that she had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being, *see id.* § 161.001(b)(1)(E); and that it was in the children's best interest to terminate her parental rights, *see id.* § 161.001(b)(2).  The trial court also appointed the Department as the managing conservator of the children.  This appeal followed.

**ANALYSIS**

**Sufficiency of the Evidence**

In her first issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's endangerment and best-interest findings.

*Standard of Review*

To terminate parental rights under Section 161.001, the Department has the burden to prove by clear and convincing evidence one of the predicate grounds in subsection (b)(1) and that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *see also* Tex. Fam. Code § 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002) (explaining that "[d]ue process requires the application of the clear and convincing evidence standard of proof in parental termination cases"). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *see In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002) (stating definition of "clear-and-convincing burden of proof" that court adopted (citing *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979))).

"In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). Legal sufficiency review of the evidence to support a termination finding requires a court to look at all the evidence in the light most favorable to the finding and consider undisputed contrary evidence to determine whether a reasonable trier of fact could have formed a firm belief or conviction that

7

its finding was true. *Id.* In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* We must give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108–09 (Tex. 2006); *see In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014) (stating that when reviewing termination order, appellate courts defer to "decisions of factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

### Endangerment Findings

Mother challenges the legal and factual sufficiency of the evidence to support the trial court's predicate findings under Subsections (D) and (E)—that (i) Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the children's physical or emotional well-being, and (ii) Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the children's physical or emotional well-being. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (explaining that only one predicate ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis in appeal challenging Subsection

8

(D) or (E) finding because of "due process concerns, coupled with the requirement for a meaningful appeal").

"'Endanger' means 'to expose to loss or injury; to jeopardize.'" *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 Tex. App. LEXIS 10272, at *13 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). "It is not necessary that the conduct be directed at the child or that the child actually suffer physical or emotional injury," the conduct does not have to occur in the presence of the child, and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Id.* at *13–14. "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Id.* at *14.

The relevant inquiry under Subsection (E) is whether evidence exists that the endangerment of the child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet denied.). "Additionally, termination under [S]ubsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent." *Id.* In contrast, the relevant inquiry under Subsection (D) is whether the child's environment, including the child's living conditions and conduct by the parents or others in the home, endangered the child's well-being. *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 Tex. App. LEXIS 938, at *9–10 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home—including physical violence or abusive conduct by one

parent toward the other parent—is part of the 'conditions or surroundings' of the child's home under subsection (D)." *Id.* at \*10 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)). Because the evidence pertaining to Subsections (D) and (E) is interrelated, we consolidate our review of the evidence. *See id.* at \*11 (citing *In re M.R.J.M.*, 280 S.W.3d at 503).

Mother argues that although there was evidence of "irresponsible choices before her children were removed and at the beginning of the case, there was no evidence that Mother still endangered" the children at the time of trial. Mother argues that she had improved her conduct and did not want to disrupt the children's placement with Grandparents but only sought visitation. She further argues that there was no evidence that she knew or was aware that the children were endangered when she left them in Father's care, that she knowingly placed them or allowed them to remain in conditions or surroundings that endangered them, or that she caused any injuries to either child. Mother testified that she was unaware of Father's abusive conduct toward the children because it happened when she was at work, that she was no longer in a relationship with Father at the time of trial, and that she did not know anything was wrong with Zane prior to taking him to the doctor in June 2022. Father also testified that she did not know that he had injured the children because it happened when she was at work.

The trial court, however, reasonably could have disbelieved this testimony, particularly because of the undisputed evidence of Zane's extensive injuries, including "healing" fractures. *See In re A.B.*, 437 S.W.3d at 503 (stating that when reviewing termination order, appellate courts defer to "the decisions of factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses"). Mother agreed that Zane had "a tibia, fibula and femur fracture to his leg"; "healing

10

fractures on both legs, ribs, right arm, left scapular spine fracture"; bruises; and "too many fractures to count."  Grandmother testified that Zane's continuing pain from his injuries required medication over a year later.  And, although Father denied that Mother knew that he had injured the children, his testimony was equivocal.  For example, he testified that he did not know how she did not know:

> Q.     How would she not know if the children were injured and you were the one taking care of them?
>
> A.     If she was at work.
>
> Q.     Well, I know.  But if the children got injured, you were taking care of them, how would she not know that you were the one [who] did it?
>
> A.     I do not know.
>
> * * *
>
> Q.     The truth of the matter is, she did know, didn't she?
>
> A.     Not really. . . .

Other evidence also supported that Mother was not credible.  For example, Mother told the hospital personnel that Zane was injured because his sister fell on him, which was not true, and Mother admitted that she had not been honest during her counseling sessions or with the court and the parties involved during the case about her ongoing relationship with Father.  The Department representative testified that during the case, Mother had denied that she was still in a relationship with him, but Father said they were, and Mother's counselor testified that she had been deceitful about being around Father from August through December 2022.

By the time of trial, it was undisputed that Mother had remained in a relationship with Father for several months during the case, and possibly longer.  *See Pruitt*, 2010 Tex. App.

11

LEXIS 10272, at *13–14 (explaining that courts may consider conduct before and after child removed as to Subsection (E)). Despite knowing that Father had assaulted Zane, that she was at risk of losing her parental rights to her children, and that there was a no-contact order against Father, Mother chose to continue to be in a relationship with Father during the case.[6] *See In re M.E.-M.N.*, 342 S.W.3d at 262 (stating that voluntary, deliberate, and conscious course of endangering conduct by parent supports finding under Subsection (E)); *see also Pruitt*, 2010 Tex. App. LEXIS 10272, at *14 ("Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being.").

Further, the trial court reasonably could have credited the undisputed evidence of Zane's extensive injuries, the testimony of Grandmother, and admissions by Mother to find that Mother was aware that Father posed a danger and risk to the children's well-being when she left them in his care. *See V.P.*, 2020 Tex. App. LEXIS 938, at *10 (stating that "parent's failure to remove herself and her children from a physically violent or abusive relationship may support a finding of endangerment under subsection (D)"); *In re M.E.-M.N.*, 342 S.W.3d at 262 (stating that factfinder may consider whether evidence exists that endangerment of child's well-being "was the direct result of Appellant's conduct, including acts, omissions, or failures to act" under Subsection (E)). Grandmother testified that Mother had told her that Father abused her prior to Mother and the children moving back in with Father and despite having a safe place to stay; and Mother admitted that prior to leaving the children in Father's care, she was aware of Father's mental health issues and had called 911 during their relationship because of an altercation with

---

[6] Mother answered, "Yes, sir," when asked, "And even knowing that he would squeeze your child until he heard popping sounds more than once, you remained friends with him, correct?"

12

Father and concerns for her safety. Father also testified to throwing things when arguing with Mother in the children's presence.

Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the endangerment findings against Mother. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re A.C.*, 560 S.W.3d at 630–31.

*Best Interest*

Relevant factors in assessing the best interest of a child include: (i) the desires of the child, (ii) the stability of the home or proposed placement, (iii) parental abilities, (iv) the emotional and physical needs of the child now and in the future, (v) the emotional and physical danger to the child now and in the future, (vi) the plans for the child by the individual or agency seeking custody, (vii) the programs available to assist the individuals seeking custody to promote the best interest of the child, (viii) acts or omissions by the parent showing that the parent-child relationship was not proper, and (ix) any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307 (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment"). No one factor is controlling, evidence on each factor is not required, and evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See In re C.H.*, 89 S.W.3d at 27–28; *Pruitt*, 2010 Tex. App. LEXIS 10272, at *22–23.

Although there was evidence that Mother loved her children, that they loved and were bonded with her, that she had made progress toward becoming a protective parent and

13

addressing the Department's concerns, and that her mental health issues were being resolved by medicine, the overwhelming evidence, including the evidence detailed above of Mother's endangering conduct, supports the trial court's finding that it was in the children's best interest for her parental rights to be terminated. *See In re C.H.*, 89 S.W.3d at 27–28; *see also Wischer v. Texas Dep't of Fam. and Protective Servs.*, No. 03-12-00165-CV, 2012 Tex. App. LEXIS 7523, at *36 (Tex. App.—Austin Aug. 29, 2012, no pet.) (mem. op.) (stating that jury could have found that parent lacked ability to care for child based on evidence showing "poor judgment currently and in the past"). In particular, the trial court reasonably could have found Grandmother's testimony credible that Mother knew of Father's behavior when she had a safe place to go but chose to place her children "in harm" with Father.

The trial court also could have credited the evidence of Mother's instability before and after the children were removed from her care. *See Holley*, 544 S.W.2d at 371–72 (including stability of home or proposed placement as factor in assessing best interest of child); *In re D.C.*, 128 S.W.3d 707, 717 (Tex. App.—Fort Worth 2004, no pet.) (considering parent's inability to provide stable home in best-interest determination); *see also In re M.R.J.M.*, 280 S.W.3d at 502 (explaining that factfinder may infer from past conduct endangering child's well-being that similar conduct will recur if child is returned to parent). Mother admitted that prior to the psychological examination, she had lived in seven different homes in the last five years, including being homeless for three months, living in a car for six months, and a hotel for four months, and that she was not in a position at the time of trial to have the children live with her. Although she testified that she was looking for an apartment, she was living with the father of her unborn child in a three-bedroom home with two other roommates, and prior to that, she had lived with Father for several months during the case.

14

Mother argues that it was not in the children's best interest to terminate her rights because it did not further permanence for the children because they were already placed with Grandparents. But the trial court reasonably could have determined that the children's best interest would be served by terminating the parents' rights so that Grandparents could adopt the children. *See L.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00125-CV, 2018 Tex. App. LEXIS 4544, at *3 (Tex. App.—Austin June 21, 2018, no pet.) (mem. op.) (stating that child's need for permanence is paramount consideration when determining child's present and future physical and emotional needs and that "factfinder can consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination were not ordered" (quoting *Robert T. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-12-00061-CV, 2013 Tex. App. LEXIS 2049, at *36 (Tex. App.—Austin Mar. 1, 2013, no pet.) (mem. op.))); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (concluding that factfinder could reasonably have determined that child's best interest would be better served by adoption rather than conservatorship plan).

At the time of trial, the children, who were one and two years old, were thriving and bonded to Grandparents; Grandparents were meeting their needs, including arranging speech therapy for Natalie and physical therapy for Zane; Mother admitted she was not ready to care for the children; and the Department's plan was for Grandparents to adopt the children if parental rights were terminated. *See Holley*, 544 S.W.2d at 371–72 (including stability of home or proposed placement, plans for child by individual or agency seeking custody, parental abilities, and needs of child now and in future as factors in assessing best interest of child). Further, although Mother did not seek to be the primary caregiver and expressed concern that

15

Grandparents would not allow her to see her children if her rights were terminated, Grandmother testified that they had agreed to supervised visits by a third party going forward, and the trial court reasonably could have inferred that she would be willing to resume communications with her daughter if Mother's parental rights were terminated. Grandmother testified that it had been Mother's choice to sever communications during the case.

Grandmother also testified that she did not believe that Mother could keep the children safe and that she did not trust Mother with the children, and Father testified that it was in the children's best interest to stay with Grandparents, that Grandparents' home was "good," and that he did not know if it would be a "good idea" to return the children to Mother. *See id.* at 371–72 (including danger to child now and in future as factor in assessing best interest of child). Although Mother agreed that Zane's injuries could have been fatal, she continued her relationship with Father after the children's removal. Further, the guardian ad litem for the children also advocated for termination so that Grandparents would be able to adopt the children and believed it was in the children's best interest to do so.

Viewing the evidence under the applicable standards of review, we conclude that it was legally and factually sufficient to support the trial court's best-interest findings against Mother. *See* Tex. Fam. Code § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 630–31. Because we have concluded that the evidence was sufficient to support the trial court's endangerment and best-interest findings, we overrule Mother's first issue.

**Conservatorship**

In her second issue, Mother argues that the trial court abused its discretion or erred by appointing the Department as the managing conservator of the children and

16

unnecessarily terminating her parental rights. As with her first issue, she argues that terminating her rights did not further permanence for the children. Mother relies on the children's placement with Grandparents and argues that "[i]t was their desire and intention for Mother to continue her relationship with the Children."

We, however, have already concluded that the evidence was sufficient to support the trial court's endangerment and best-interest findings. In this context, Mother does not have standing to challenge the portion of the decree appointing the Department as the children's managing conservator. *See In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (explaining that order terminating the parent-child relationship divests parent of legal rights and duties with respect to the child (citing Tex. Fam. Code § 161.206(b)); *see also A.P. v. Texas Dep't of Family & Protective Servs.*, Nos. 03-18-00780-CV, 03-18-00781-CV, 2019 Tex. App. LEXIS 2268, at *2–4 (Tex. App.—Austin Mar. 26, 2019, no pet.) (mem. op.) (concluding in context of parents' appeal from judgment terminating their parental rights, that parents lacked standing to challenge trial court's striking of grandmother's petition in intervention and collecting cases in which court concluded that appealing parent lacked standing to complain of errors that did not injuriously affect them or that affected rights of others); *In re H.M.M.*, 230 S.W.3d 204, 204–05 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (holding court lacked jurisdiction to consider mother's appeal of trial court's failure to grant sole custody to her father after it terminated her parental rights). Further, once an appellate court overrules a parent's challenge to an order terminating the parent's rights, the trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination." *See In re J.D.G.*, 570 S.W.3d at 856 (citation omitted). We overrule Mother's second issue.

17

## CONCLUSION

Having overruled Mother's issues, we affirm the trial court's decree of termination.

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Kelly and Theofanis

Affirmed

Filed:   January 12, 2024

18