# Court of Appeals
## Tenth Appellate District of Texas

---

10-24-00381-CV

---

In the Interest of K.P.-A. and K.P.-A.,
Children

---

On appeal from the
474th District Court of McLennan County, Texas
Judge Alan Bennett, presiding
Trial Court Cause No. 2023-1142-6

---

JUSTICE SMITH delivered the opinion of the Court.

## MEMORANDUM OPINION

Mother and Father appeal the trial court's order terminating their parental rights to their twin daughters, "Kolbie" and "Katie." On appeal, Mother and Father challenge the legal and factual sufficiency of the evidence to support their respective predicate grounds for termination and the trial court's best-interest findings. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (b)(1)(E), (b)(2). Mother also argues that the trial court abused its discretion by appointing the Department of Family and Protective Services ("the Department") as the managing conservator of the children. We affirm.

## Background

On April 27, 2023, Father called Mother at work after he found three-month-old Kolbie non-responsive. Mother told him to call 9-1-1, and Father complied. According to Mother, the paramedics examined Kolbie and informed the parents that she was in "the stage after a seizure." Kolbie was transported to McLane's Children's Hospital where someone contacted the Department to report suspected child abuse. The report was based on Kolbie's CAT scan that revealed she was suffering from extensive bilateral subdural hematomas.

Representatives from the Department interviewed both parents at the hospital. The Department learned that Kolbie had a twin sister, Katie, and that Mother and Father were the children's primary caregivers. The parents explained that they generally had rotating work schedules that allowed one parent to watch the children while the other parent worked.[1] Neither Mother nor Father could explain how Kolbie's brain injury may have occurred, though Father guessed that she might have pushed her feet too hard against her crib and hit her head. During this interview, the Department also learned that the parents had taken Kolbie to the Ascension Providence Hospital emergency

---

[1] According to the record, the paternal grandmother and her partner also saw the children on at least one occasion after they were born, though there is conflicting evidence in the record regarding how often they may have kept the children and the last time the children were in their care. Though the record is unclear as to how this determination was reached, "after running background checks and communicating," the Department ruled out the paternal grandmother as someone who could have caused the injuries to the children.

room two days earlier, on the evening of April 25, 2023, because she had projectile vomited. There is conflicting evidence in the record regarding how long Kolbie had been exhibiting this symptom. The trial court found that Kolbie began vomiting on or about April 20, 2023, which is supported by Father's statement to the Department that Kolbie began vomiting the week before.

The record reflects, and all parties agree, that the parents left the Ascension Providence Hospital emergency room on April 25th before obtaining medical treatment for Kolbie. Mother testified that after waiting for a few hours in the waiting room, one of the triage nurses advised her that they were understaffed and that they could take Kolbie to her pediatrician in the morning if they did not want to wait. According to Mother, no one at the hospital advised that they needed to stay at the hospital for further testing; however, medical records admitted at trial indicated that a physician's assistant advised of the "nature of this exam and the possible need for further testing" and that "[t]he patient verbalized understanding."

Mother and Father testified that they took Kolbie to a pediatrician the following day, on April 26, 2023. Mother stated that Kolbie vomited two more times between leaving the emergency room and the pediatrician visit. Both parents testified that the pediatrician did not see anything wrong with Kolbie

and thought she may have a virus. However, the trial court apparently disbelieved the parents' assertions that they took Kolbie to see a pediatrician on April 26th by finding that after leaving the Ascension Providence Hospital on April 25th, "[n]either Respondent sought further medical treatment for [Kolbie] until April 27, 2023 when [Father] found her non-responsive."[2]

Kolbie's subdural hematomas, along with her seizure and vomiting, led the emergency room personnel at McLane's Children's Hospital to contact neurosurgeon Dr. David Garrett at approximately 2:00 a.m. on April 28th. After examining Kolbie, Dr. Garrett performed a surgical procedure that required drilling a hole into Kolbie's skull to drain the subdural hematomas. At the Department's request, Katie was also examined on April 28th. Based on the concerning results of both children's skeletal surveys that revealed possible non-accidental injuries to both children, the Department removed Kolbie and Katie and placed them in foster care.

In July of 2023, the parents questioned whether children's injuries may have been caused by genetic disorders or birth defects. The Department asked for documentation of any potential birth defects or genetic disorders, but

---

[2] This finding is also supported by trial testimony from Dr. David Garrett that had the parents taken Kolbie to a pediatrician, the pediatrician should have noticed Kolbie's "biparietal enlargement" – enlargement of the head – as presenting a potentially abnormal situation.

according to the conservatorship specialist, no such documentation was ever provided.

Eventually, the case proceeded to a bench trial. The Department called three expert witnesses: Dr. David Garrett, Dr. Kayla Washuta, and Dr. Megan Lyle. Mother called her own expert witness, Dr. John Galaznik. Each of the expert witnesses offered opinions on the potential causes and timing of the children's various injuries. The parents maintained that they did not know how the children's injuries occurred and that the Department's involvement was unwarranted. At the conclusion of the bench trial, the trial court terminated Mother and Father's parental rights under both endangerment predicate grounds, found termination to be in the children's best interest, and appointed the Department as managing conservator of the children. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (b)(1)(E), (b)(2). The trial court filed findings of fact and conclusions of law at Mother's request.

## Standard of Review

The standards of review for legal and factual sufficiency in cases involving the termination of parental rights are well-established and will not be repeated here. *See In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency); *see also In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009). The factfinder is the sole

judge of the credibility of the witnesses and the weight to give their testimony. *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). We give due deference to the factfinder's findings and must not substitute our judgment for that of the factfinder. *Id.*

## Predicate Grounds

In Father's first issue and Mother's first and second issues on appeal, both parents contend that the evidence was legally and factually insufficient to support the trial court's endangerment findings under Subsections D and E. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (b)(1)(E). We disagree.

AUTHORITY

Termination of parental rights under Subsection D or E requires proof of endangerment, which means to expose the children to loss or injury, or to jeopardize. *Tex. Dep't. of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). The endangerment analysis under Subsection D focuses on evidence relating to the children's environment to determine if the environment was a source of endangerment to the children's physical or emotional well-being. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *Id.* A parent's conduct in the home can

create an environment that endangers the well-being of a child. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

Under Subsection E, the relevant inquiry is whether evidence exists that the endangerment of the children's well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied). Scienter is not required for a parent's own acts to constitute endangerment under Subsection E. *See In re L.S.*, No.10-22-00119-CV, 2022 WL 3655395, at *2 (Tex. App.— Waco Aug. 24, 2022, no pet.) (mem. op.) (citing *In re I.D.G.*, 579 S.W.3d 842, 851 (Tex. App.—El Paso 2019, pet. denied) (op. on reh'g)). It is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533. The specific danger to the child's well-being may be inferred from parental misconduct alone. *Id.* Because the evidence pertaining to Subsections D and E is interrelated, we may conduct a consolidated review. *In re M.R.J.M.*, 280 S.W.3d at 503.

THE EVIDENCE AT TRIAL

Dr. Kayla Washuta, a physician who is board certified in pediatric medicine and employed in the pediatric orthopedics division at Baylor Scott & White Hospital, testified regarding the children's fractures. She explained that fractures cannot always been seen immediately on an X-ray, but they

become more obvious on the imaging seven to fourteen days later when they begin healing and developing a callous. Dr. Washuta reviewed the children's imaging from April 28th and May 16th, and she personally examined both of the twins on June 13th. From Kolbie's existing imaging, Dr. Washuta found that she had suffered a liver laceration, multiple rib fractures without evidence of healing and one rib fracture that was already healing. She testified that the follow-up imaging from June 13th revealed that Kolbie "had no issues." From Katie's existing imaging, Dr. Washuta noted that she had a subacute distal radius fracture – clarified as a wrist fracture – on her left side. Dr. Washuta ruled out the insertion of an IV into Katie's wrist as the cause of her wrist fracture, noting that the wrist fracture was already healing when the image was taken. From her imaging from May 16th, Dr. Washuta determined that Katie had healing rib fractures and noted a possible tibial corner fracture. Katie's follow-up imaging from June 13th indicated that her wrist fracture was continuing to heal as expected and her tibial corner fracture was no longer visible.

When asked whether any genetic conditions or medical conditions could cause the types of fractures noted in these children, Dr. Washuta stated osteogenic imperfecta could possibly cause them. Though she was unsure if the children were tested for osteogenic imperfecta, she testified that the

children did not have that diagnosis. She also discussed rickets, explaining that there were no signs of rickets in the imaging done on Kolbie or Katie and that rickets "definitely wasn't the cause" of the children's fractures. Further, she agreed that if the children had rickets but were not treated for that condition, they would continue to sustain additional fractures until the condition was treated. Dr. Washuta also ruled out low Vitamin D levels as the cause of the twins' fractures, despite their Vitamin D levels being "on the lower end of normal." According to Dr. Washuta, the fractures that these children sustained required "a decent amount of force" and were "highly suspicious for some sort of non-accidental trauma." She also agreed that the type and number of injuries sustained by the children "would have actually been felt as a significant amount of pain to these babies."

Dr. David Garrett, a board-certified neurosurgeon with over thirty years of pediatric neurosurgery experience, discussed the head injuries sustained by each child. Regarding Kolbie, Dr. Garrett explained that trauma is "overwhelmingly the most common cause" of subdural hematomas, though there are non-traumatic causes such as severe cases of meningitis. He further explained that a subdural hematoma found in a child Kolbie's age would not be caused by birth trauma because subdural hematomas caused by birth trauma "[a]lways go away within a month," and that he could "absolutely

exclude birth trauma" as the cause of Kolbie's subdural hematomas. Based on the color of the fluid drained from Kolbie's head and the fact that no acute blood was observed in the fluid, Dr. Garrett opined that the initial trauma in her brain was possibly caused about two weeks before the surgery. Additionally, based on the mixed density Dr. Garrett observed on Kolbie's CAT scan, he determined that she had two different hemorrhages of two different ages that "[t]o a very high degree of certainty" were caused by multiple traumas to her head. He believed that Kolbie's rib fractures being in different stages of healing offered further support for his multiple-trauma theory. Though he did not personally examine Katie, Dr. Garrett testified that her subarachnoid hemorrhage could not possibly be the result of birth trauma because a subarachnoid hemorrhage only lasts up to three weeks before disappearing. In Dr. Garrett's opinion, Kolbie's subdural hematomas and Katie's subarachnoid hemorrhage could only have been caused by blunt force trauma to the head.

Dr. Megan Lyle, a board-certified physician in general pediatrics and in pediatric hematology and oncology, testified that the forensics team at McLane's Children's Hospital requested her to consult on the twins' cases to rule out bleeding or clotting disorders. She personally examined the children at follow-up appointments after their initial exams and also reviewed the imaging from their other examinations. Dr. Lyle did not find any clotting

disorders or bleeding disorders with either twin. She explained that Kolbie had "such extensive bleeding that--that could only be sustained with some sort of trauma." Kolbie also sustained two liver lacerations without any external lacerations, which Dr. Lyle testified "can only be sustained by blunt force trauma." Dr. Lyle also described Katie's bleeding as "highly suggestive of trauma" and as "consistent with shearing trauma," which she described as a "shaking back and forth of the head." Dr. Lyle confirmed that the head injuries sustained by each twin were not from birth trauma and estimated that Kolbie's injury likely occurred in "the last week or so" before she went to the hospital. She testified that the testing was also negative for inherited conditions associated with rebleeding from a previous traumatic incident.

Mother called Dr. John Galaznik, who is board certified in pediatrics, as an expert witness at trial. He did not personally examine either of the twins, but he reviewed their medical records and imaging. Regarding the children's head injuries, Dr. Galaznik opined that "trauma is not required to explain them and […] not really indicated by the objective findings[.]" He testified that there was "no demonstrated brain injury" in Kolbie's imaging and that he could not discount the possibility that her condition occurred in utero or at birth. Dr. Galaznik opined that Kolbie's "presentation is basically textbook for […] chronic subdural hematohygroma," and that her imaging was "entirely

consistent with a well-recognized medical process; and trauma is not required." However, he could not rule out blunt trauma as the cause. Regarding Kolbie's rib imaging, Dr. Galaznik noted "cupping" and testified that what he observed was "entirely consistent with the rib findings of perinatal rickets of an infant who was born Vitamin D deficient[.]" He also explained that Kolbie's imaging did not necessarily show any fractures. Additionally, Dr. Galaznik explained that Katie's wrist fracture could have been caused by starting her IV at the hospital. He also disagreed with the opinion that Kolbie sustained any liver lacerations based on her lack of elevated liver enzymes. Ultimately, Dr. Galaznik agreed that the children's conditions "could be consistent with child abuse," though he did not agree that child abuse was a more likely cause than the non-abusive causes he discussed in his testimony.

ANALYSIS

We first address Father's argument that the evidence was legally insufficient to support the endangerment findings "because the medical opinions offered, and given credibility by the court, were not in compliance with specific provisions of the Family Code[,]" namely Sections 261.3017 and 261.30175(b).[3] *See* TEX. FAM. CODE ANN. §§ 261.3017, 261.30175(b). Father

---

[3] Section 261.30175(b) states:

appears to argue that the testimony of the Department's expert witnesses should have been excluded or not considered by the trial court due to the alleged noncompliance with these statutory provisions. However, Father's complaints about noncompliance with these statutes were not presented to the trial court, and Father did not object to the admissibility of the testimony of the Department's three expert witnesses at trial. Therefore, these complaints are not preserved for our review. *See* TEX. R. APP. P. 33.1(a)(1).

Both parents point to Dr. Galaznik's medical testimony offering natural causes for the children's injuries to urge that the evidence was insufficient to support the endangerment findings. However, conflict in testimony as to the

---

(b) A health care practitioner who reports suspected abuse or neglect of a child may not provide forensic assessment services in connection with an investigation resulting from the report. This subsection applies regardless of whether the practitioner is a member of the network or system.

The relevant portions of Section 261.3017 of which Father claims noncompliance state:

(c-2) Before referring a child's case [for a specialty consultation] under Subsection (c), the department shall provide to the child's parent or legal guardian or, if represented by an attorney, the attorney of the parent or legal guardian written notice of the name, contact information, and credentials of the specialist. The parent, legal guardian, or attorney, as applicable, may object to the proposed referral and request referral to another specialist. The department and the parent, legal guardian, or attorney, as applicable, shall collaborate in good faith to select an acceptable specialist from the proposed specialists; however, the department may refer the child's case to a specialist over the objection of the parent, legal guardian, or attorney.

…

(e) This section may not be construed to prohibit a child's parent or legal guardian or, if represented by an attorney, the attorney of the parent or legal guardian from otherwise obtaining an alternative opinion at the parent's, legal guardian's, or attorney's, as applicable, own initiative and expense. The department shall accept and consider an alternative opinion obtained and provided under this section and shall document its analysis and determinations regarding the opinion.

TEX. FAM. CODE ANN. §§ 261.3017(c-2), (e), 261.30175(b).

cause of the children's injuries is a matter of credibility left to the determination of the trial court. *See In re J.D.B.*, 435 S.W.3d 452, 464 (Tex. App.—Dallas 2014, no pet.) (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006)). The factfinder may weigh witness credibility, consider circumstantial evidence, and draw reasonable inferences from the evidence they choose to believe. *In re C.E.*, 687 S.W.3d 304, 309 (Tex. 2024) (citing *Benoit v. Wilson*, 239 S.W.2d 792, 797 (Tex. 1951)). Here, the trial court noted that the parents offered alternative explanations for the children's injuries including rickets, Vitamin D deficiency, and birth trauma, but found that the Department's expert witnesses were able to rule out each proffered explanation. On the other hand, Dr. Galaznik could not rule out blunt trauma as the cause of the brain injuries and agreed that the children's injuries could be consistent with child abuse. Further, the trial court found that the children were in their parents' possession when they sustained their injuries, and evidence was presented that neither child had sustained any new fractures over the eighteen-month period that the children had been in foster care. It was within the province of the trial court to find, based on the evidence presented, that Kolbie and Katie's injuries could only be explained by traumatic injury that was not sustained at birth.

Further, the trial court was entitled to disbelieve the parents' assertions that they were unaware of the children's injuries. *See C.H. v. Tex. Dep't. of Fam. & Prot. Servs.*, 389 S.W.3d 534, 541 (Tex. App.—El Paso 2012, no pet.). A child's unexplained, non-accidental fractures in various stages of healing support a reasonable inference that the child's caregivers knew of the injuries and their cause, and supports termination under Subsection D. *In re L.M.M.*, 522 S.W.3d 34, 45 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). Kolbie had rib fractures in various stages of healing described by Dr. Washuta as "highly suspicious for some sort of non-accidental trauma," and the mixed density in her CAT scan indicated multiple traumatic injuries to her head that occurred at different times. Katie sustained a head injury, wrist fracture, rib fractures, and possible tibial fracture. As noted above, once the children were removed from the environment with their parents, neither child sustained any new fractures. This evidence supports termination under Subsection D.

Additionally, a parent's failure to provide appropriate medical care for a child may constitute endangering conduct under Subsection E. *In re J.D.G.*, 570 S.W.3d 839, 852 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). This is true even if the parent did not cause the need for medical treatment. *Id.* Though the children's injuries were not externally visible, Dr. Washuta explained that non-verbal children who have suffered fractures would likely be

tender to the touch in the affected areas, that they may stop moving the fractured limb, and that they tend to get fussier when the fractured area is touched or manipulated. She agreed that the number and severity of the children's injuries would have been felt as a significant amount of pain to the children. Further, the trial court found that Kolbie had been vomiting for approximately five days before the parents sought medical care for her, and even then, the parents undisputedly left the emergency room without getting Kolbie any medical treatment. Evidence was presented that they decided to leave despite being advised that Kolbie may need further testing. At trial, both Mother and Father agreed that leaving the emergency room without obtaining medical treatment for Kolbie was a poor decision. The trial court found that the parents did not seek medical care the following day, despite Kolbie's continued display of symptoms of severe injury. The parents' failure to obtain medical care for Kolbie resulted in her condition worsening to the point that she suffered a seizure and became non-responsive, and delayed necessary medical intervention to drain her subdural hematomas. The record is devoid of any evidence that the parents ever sought medical care for any of Katie's fractures or her brain injury.

We find that the evidence is legally and factually sufficient to support the trial court's termination of Mother and Father's parental rights under

Subsections D and E. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (b)(1)(E). We overrule Father's first issue on appeal and Mother's first and second issues on appeal.

## Best Interest

In Mother's third issue and Father's second issue on appeal, the parents challenge the legal and factual sufficiency of the evidence supporting the trial court's best-interest findings. *See id.* at § 161.001(b)(2).

AUTHORITY

In determining the best interest of a child, a number of factors have been consistently considered which were set out in the Texas Supreme Court's opinion, *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). This list is not exhaustive, but simply identifies factors that have been or could be pertinent in the best-interest determination. *Id.* There is no requirement that all of these factors must be proved as a condition precedent to parental termination, and the absence of evidence about some factors does not preclude a factfinder from reasonably forming a strong conviction that termination is in the children's best interest. *See In re C.H.*, 89 S.W.3d at 27. The *Holley* factors focus on the best interest of the children, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regul. Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). And while no one factor is controlling, the

analysis of a single factor may be adequate in a particular situation to support a finding that termination is in the children's best interest. *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

ANALYSIS

A parent's past endangering conduct may create an inference that the parent's past conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *In re J.S.S.*, 594 S.W.3d 493, 505 (Tex. App.—Waco 2019, pet. denied). The trial court found that the parents' failure to attend to the children's medical needs at a critical time was evidence of their unwillingness or inability to provide for the children's physical needs and an indication of future endangerment to the children. Specifically as to Father, the trial court expressed concern for his parenting abilities based on his failure to call 9-1-1 when he found his child unresponsive. Though both parents testified that they learned better parenting skills through their services, the trial court noted concern for repetition of their endangering conduct because they refused to acknowledge that the children's injuries and conditions were the result of non-accidental traumatic injury. Testimony from the Department caseworker indicating the parents' lack of concern or interest in the medical progress of the children also demonstrates an unwillingness or inability to provide for the children's physical needs.

When children are too young to express their desires, the factfinder may consider that the children have bonded with the caregiver, are well-cared for by them, and have spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Both Kolbie and Katie were infants at the time of removal and had been in foster care for eighteen months at the time of trial. Following removal, the parents had weekly visitations with the children. Though both parents argue that their interactions with the children at the visitations demonstrate that the children are bonded with them, evidence was presented that the parents consistently struggled to console Kolbie during visits. According to the caseworker, Kolbie would cry for minutes at a time, causing the parents to sometimes become flustered before the caseworker had to intervene. The trial court found this evidence was an indication that the parents did not have a close bond with Kolbie and lacked sufficient parenting skills to meet her needs. Evidence was also presented that the twins would interact with each other more often than with the parents at the visitations. Meanwhile, the record demonstrates that the foster mother has consistently provided for the children's medical needs by taking them to follow-up medical appointments and therapies. She testified that the children are bonded to her and to her extended family and that she intends to adopt the children. Her testimony was supported by the program

director of Arrow Child and Family Ministries, who observed the foster mother with both children in the home and classified their bond as "undeniable."

The parents emphasize evidence contrary to the trial court's finding - such as their participation in services and the undisputed fact that Mother maintained an appropriate residence - as proof that the evidence is insufficient to support the best-interest finding. We find that the evidence contrary to the trial court's finding is not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination is in the children's best interest. Considering the record before us under the appropriate standards, we find that the evidence was legally and factually sufficient to support the best-interest findings as to both children. Accordingly, we overrule Father's second issue and Mother's third issue on appeal.

## Conservatorship

In her fourth issue on appeal, Mother argues that the trial court abused its discretion by appointing the Department as managing conservator of the children. We disagree.

STANDARD OF REVIEW

Conservatorship determinations are governed by a preponderance-of-the-evidence standard and are subject to review for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). We will reverse a trial court's

conservatorship appointment only if we determine it was arbitrary or unreasonable. *Id.*

ANALYSIS

The trial court's termination order appoints the Department as managing conservator of both children and makes findings pursuant to Section 153.131(a) that "the appointment of [Mother or Father] as permanent managing conservator of the children is not in the children's best interest because the appointment would significantly impair the children's physical health or emotional development." *See* TEX. FAM. CODE ANN. § 153.131(a). In cases where a trial court's termination of the parent-child relationship is reversed, a parent is required to independently challenge a trial court's conservatorship finding under Section 153.131(a) to obtain reversal of the conservatorship appointment. *See In re J.A.J.*, 243 S.W.3d at 616-17.

However, if a reviewing court upholds the termination of parental rights on appeal, the appointment of the Department as managing conservator may be considered a consequence of the termination pursuant to Section 161.207. *See* TEX. FAM. CODE ANN. § 161.207; *In re J.H.*, No. 10-24-00057-CV, 2024 WL 3715840, at *5 (Tex. App.—Waco Aug. 8, 2024, pet. denied) (mem. op.). Section 161.207, entitled "Appointment of Managing Conservator on Termination," provides that "[i]f the court terminates the parent-child relationship with

respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE ANN. § 161.207(a).

Because we have affirmed the judgment terminating the parental rights of both parents, based on our review of the evidence, we conclude that the trial court did not abuse its discretion when it appointed the Department as managing conservator of the children. We overrule Mother's fourth issue on appeal.

_____
STEVE SMITH
Justice

OPINION DELIVERED and FILED: May 22, 2025

Before Chief Justice Johnson,
    Justice Smith, and
    Justice Harris
Affirmed
CV06

