**Opinion issued May 7, 2026**



In The

# Court of Appeals

For The

# First District of Texas

---

**NO. 01-25-00958-CV**

---

**IN THE INTEREST OF K.M.N., P.N. III, E.J.N., I.A.N., B.L.N., C.A.N., S.V.N., L.F.N., AND S.N., CHILDREN**

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-01750J**

---

## MEMORANDUM OPINION

Appellants C.M. (Mother) and P.N. (Father) appeal the trial court's final decree terminating their parental rights to nine children. We affirm.

## Background

The nine children subject to this case, with their birth years, are (1) Kim, 2010; (2) Peter, 2012; (3) Elliot, 2013; (4) Ian, 2015; (5) Bree, 2016; (6) Craig, 2019; (7) Stella, 2020; (8) Lucy, 2022; and (9) Sara, 2024.[1]

---

[1] We use pseudonyms for the children. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.9.

In July 2024, the Texas Department of Family and Protective Services was informed Mother had given birth to Sara in the hotel room where she lived. Mother and Sara were taken to the hospital, where they tested positive for cocaine.

Mother told DFPS she was her children's primary caregiver but was not employed and had no income. Mother initially denied illicit drug use but eventually admitted she had used cocaine two days before Sara's birth. Mother did not know the name of the hotel or its address.

Mother told the investigator she had nine children, one of whom (Peter) was with her and Sara at the hospital; the remaining seven were at the hotel with Father. But Mother's sister told the investigator Mother had eleven children. Asked about the other two children, Mother said her eighteen-year-old daughter Sadie was living with Mother's sister, and her seventeen-year-old son James's whereabouts were unknown. Mother said James was not Father's biological child and "it was too much trouble to keep him," so they "got rid of him" because that was best for Mother and Father's relationship. Mother said she gave James to a relative in California but could not recall the name of the relative.

The DFPS investigator learned Father is a registered sex offender and not allowed to be alone with children. Mother said she knew Father was registered as a sex offender but was unaware he was prohibited from being alone with children.

The investigator went to the hotel after learning the address. The investigator could hear noise inside the hotel room, but no one answered the door, and she called the police to do a welfare check. The police discovered Father had an active felony warrant for his arrest due to his failure to update his sex-offender registration.

After gaining access to the room, the DFPS investigator spoke with the children. The investigator described the hotel room as filthy, having two beds, and containing little children's clothing. The investigator heard the younger children calling Kim (age thirteen) and Peter (age eleven) "Mom" and "Dad." The investigator also learned the children did not go to school. DFPS took the children into custody and found placements for them, and the police arrested Father on the outstanding warrant.

After Father was released from jail on bond and Mother was discharged from the hospital, they disappeared while their children remained in DFPS's custody. In trying to locate them, police spoke with family members, who provided varying accounts of James's whereabouts, including that he was dead. Police were told Father was "very rough with [James] physically, verbally abusive towards him."

After two months, police located Mother and Father. Police interviewed Mother, who eventually confessed Father had killed James about nine years ago. Mother explained she was in the shower and could hear Father beating James in the living room. When Mother came out, she saw Father beating James. James fell

backwards, hit his head, and never moved again. They tried to revive James by running cold water on him, to no avail. Father placed James's body in a bedroom, locked the door, and left him overnight. The next morning, Mother saw Father carrying what appeared to be a body in a trash bag. She thinks Father disposed of James's body in a trash can. Police also learned that Father injured Mother on the night James was killed, and she called an ambulance for herself.

Father told police he did not know anything about James because he was incarcerated at the time James disappeared. When police noted jail records showed Father was not incarcerated at that time, Father continued to deny any knowledge of James's whereabouts and told police to speak with Mother. As of trial, the police's investigation regarding James remained open.

As the investigation continued, DFPS learned Father physically abused Mother and the children frequently, causing bruises and injuries. They also learned Father has a history of sexual-offense charges and allegations as well as convictions for many other offenses. He was a registered sex offender for being convicted of indecency with a child, for which he served three years in prison. The victim was Sadie, Mother's oldest daughter (and Father's stepdaughter), who was eleven at the time of the assault. Mother's sister testified that when she was eleven, Father had sexually assaulted her; Father has been indicted for this incident. Father's stepsister also said he had sexually assaulted her while they were growing up.

4

Mother and Father have a history of drug use.  During this case, Mother tested positive for cocaine, benzoylecgonine, cocaethylene, and butalbital, although her cocaine levels dropped during the case.  Mother testified she had not used cocaine since becoming involved with DFPS.

The trial court held a bench trial in August and September 2025.  The court heard evidence that, despite knowing Father had beaten James to death, physically abused Mother and the children, and sexually abused her and other family members, Mother never took any meaningful steps to protect her children or herself from Father.  Mother testified she feared Father, but she never tried to leave him, including during the three years he was in prison for sexually assaulting Sadie.

The trial court entered a final decree terminating Mother's and Father's parental rights.  The trial court found Mother's and Father's acts and omissions satisfied three of the predicate termination grounds, Texas Family Code sections 161.001(b)(1)(D), (E) and (J), and that termination is in the children's best interests.  Mother and Father now appeal.

**Analysis**

In a single issue, Mother contends the evidence is legally and factually insufficient to support the trial court's best-interest finding.  Father's counsel filed an *Anders* brief stating Father has no non-frivolous appellate grounds.

**A.** **Termination of Mother's parental rights**

**1.** **Standard of review and relevant law**

To terminate parental rights under the Family Code, the Department must establish by clear and convincing evidence that (1) a parent committed one or more statutory predicate termination grounds, and (2) termination is in the child's best interest. TEX. FAM. CODE § 161.001(b)(1)–(2); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. "This heightened burden of proof affects the standard of review in an evidentiary challenge on appeal." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022).

In a legal-sufficiency review in a termination case, we cannot ignore undisputed evidence contrary to a finding, but we must otherwise assume the factfinder resolved disputed facts in the finding's favor. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). The evidence is legally insufficient if, viewing all of it in the light most favorable to a finding and considering undisputed contrary evidence, a reasonable factfinder could not form a firm belief or conviction that the finding is true. *Id.* at 631. In a factual-sufficiency review, we must weigh disputed evidence contrary to a finding against all the evidence in the finding's favor. *Id.* The evidence is factually insufficient if, in view of the entire record, the disputed evidence a

reasonable factfinder could not credit in the finding's favor is so significant that the factfinder could not have formed a firm belief or conviction that the finding is true. *Id.* In reviewing evidentiary sufficiency, we are mindful that the factfinder determines witness credibility. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

There is a strong presumption that the best interest of a child is served by keeping the child with his or her natural parent. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a). Courts consider non-exclusive factors in reviewing the sufficiency of the evidence supporting a best-interest finding: (1) desires of the child; (2) present and future physical and emotional needs of the child; (3) present and future emotional and physical danger to the child; (4) parental abilities of the persons seeking custody; (5) programs available to assist those persons seeking custody in promoting the best interest of the child; (6) plans for the child by the individuals or agency seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

## 2. Sufficiency of the evidence supporting the best-interest finding

The three youngest children, Stella, Lucy, and Sara, were too young at trial to express a desire about returning to Mother, but the bonds they have formed, and the positive progress they have made, with their foster family suggest they would want to remain there; the foster family would like to adopt the children. *See In re A.J.D.-J*, 667 S.W.3d 813, 833 (Tex. App.—Houston [1st Dist.] 2023, no pet.) (explaining circumstantial evidence may support where child wants to live).

The six older children were initially placed in a foster home together. That ended when Elliot sexually assaulted his younger brother, after which all six children were removed from that home. Kim and Bree went to one foster home; Peter, Ian, and Craig to another; and Elliot went to a residential treatment center.

Peter, Ian, and Craig are doing well at their foster home. Kim and Bree are also doing "fairly well" in their placement and feel comfortable and safe there; Bree wants to stay with the foster parents. The foster families plan to keep the children until they reach the age of majority.

The guardian ad litem testified Elliot is getting the care he needs in the residential treatment center and "likes it there." Elliot has said he would like to stay in the center.

Some of the older children have expressed interest in returning to Mother, and supervised visits with Mother occurred during this case. After one visit, the

children's therapist reported it "did not go well" because Mother "continues to be disengaged with her children" and "[m]ost of the children were not trying to engage with [M]other either." The guardian ad litem testified the visits led to "behavioral issues" with the boys, and Kim was "very sad for days" afterward. The ad litem opined it would not be in the children's best interest to have further contact with Mother because contact would be "keeping up the trauma."

The evidence strongly supports that Mother was not meeting the children's educational, psychological, medical, housing, clothing, and nutritional needs. Before, the children lived in a filthy, small hotel room where they shared a single bed and were without adequate clothing and food. The primary caregivers for the younger children were often Kim and Peter, whom the younger children called "Mom" and "Dad." The children's needs are now being met in their current placements, including attending school with individualized education programs and receiving medical care and therapy.

Mother's inability to protect the children from emotional and physical danger is supported by the evidence. Even assuming she could not have prevented Father from beating James to death, Mother did nothing about it after the fact. She failed to report the beating to authorities, even after calling an ambulance to treat her own injuries that night, and then for the next decade, she lied about James's whereabouts to conceal his death. Although Mother testified she was scared of Father, there is no

9

evidence she availed herself of the opportunities to leave him, including during the three years he was in prison. After Mother failed to leave Father, Father continued to physically abuse her and the children. And she continued to leave the children in Father's care even though he is a registered sex offender who had sexually assaulted Mother and other minor family members. Additionally, Mother used cocaine around the children, had them panhandling for money, and disappeared for over two months when DFPS became involved without checking on the children's well-being.

During this case, Mother has taken some steps toward improvement—she has a job, made plans to get an apartment, and completed many of the tasks required by the court-ordered family-services plan. She also testified she is done with Father, although her sister testified Mother in the past has gone "right back to [Father]" upon his release from prison. The trial court was free to find Mother's recent conduct does not erase her long history of profound failure to care for and protect the children. *See In re J.O.A.*, 283 S.W.3d at 346 ("[E]vidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices."); *In re J.D.G.*, 570 S.W.3d 839, 851 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("A parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being.").

10

We conclude the *Holley* factors support that termination of Mother's parental rights is in the children's best interests. *See In re A.J.D.-J.*, 667 S.W.3d at 829 (in considering the *Holley* factors, "we are required to evaluate the evidence holistically and consider its cumulative force, rather than weighing each individual piece of evidence in isolation from the remainder"). Viewing all the evidence in the light most favorable to the trial court's best-interest finding and considering undisputed contrary evidence, the evidence is legally sufficient to support the finding. *See A.C.*, 560 S.W.3d at 631. The evidence is also factually sufficient because, viewing it all, the disputed evidence a reasonable factfinder could not credit in the finding's favor is not so significant that the trial court could not have formed a firm belief or conviction that the finding is true. *Id.* We overrule Mother's sole issue.

## B. Termination of Father's parental rights

Father's court-appointed counsel filed an *Anders* brief, stating he is unable to raise any arguable grounds for appeal. *See Anders v. California*, 386 U.S. 738, 744 (1967). The *Anders* procedures apply in termination of parental rights cases. *In re J.S.*, 584 S.W.3d 622, 638 (Tex. App.—Houston [1st Dist.] 2019, no pet.). Our Court notified Father that his counsel had filed an *Anders* brief, that he had the right to file a pro se response, and that he was entitled to a copy of the appellate record to assist in preparing a response. Father did not file a response.

Counsel's brief meets the minimum *Anders* requirements by presenting a professional evaluation of the record and stating why there are no arguable grounds for reversal on appeal. *See Anders*, 386 U.S. at 744; *In re Schulman*, 252 S.W.3d 403, 406 (Tex. Crim. App. 2008). We have independently reviewed the entire record and agree with counsel's assessment that Father's appeal is frivolous. *In re A.M.*, 495 S.W.3d 573, 582 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). Accordingly, we affirm the trial court's termination decree as to Father.

Father's counsel correctly recognizes "he may not withdraw until all relief is exhausted." The frivolous nature of an appeal is not sufficient good cause for withdrawal in an appeal from the termination of parental rights. *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (per curiam). If Father, after consulting with counsel, desires to pursue a petition for review to the Supreme Court of Texas, counsel's obligations can be met by filing a petition for review that satisfies *Anders*. *See id.* at 27–28; *In re A.M.*, 495 S.W.3d at 583.

## Conclusion

We affirm the trial court's judgment.


Andrew Johnson
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.